**Raymond C. BYERS, Appellant,**

v.

**Guinevere E. BYERS, Appellee.**

**No. 16825.**

United States Court of Appeals
Fifth Circuit.
April 7, 1958.

Wm. Andress, Jr., Dallas, Tex. (Richard B. Humphrey, Dallas, Tex., on the brief), for appellant.

Chas. C. Crenshaw, Sr., Lubbock, Tex. (Crenshaw, Dupree & Milam, Lubbock, Tex., on the brief), for appellee.

Before JONES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal presents two matters, one procedural-jurisdictional, the other substantive. Both arise from the narrow question of whether, under the one peculiar contingency described in the grandfather's will, and which occurred, the illegitimate grandson (Raymond) is entitled to share with his legitimate half-sister (Guinevere) as remainderman on the termination of the life estate of their aged, but living, father (Clifford).

The procedural-jurisdictional question has been raised by us for the Court below assumed jurisdiction and neither of the parties there or here challenged it. The requisite diversity and amount in controversy is present. Our concern arises from the fact that this suit, brought by Raymond, a citizen of Indiana, against his sister, Guinevere, a citizen of Texas, while their father is still living, seeks a declaration of the rights in property, real and personal, devised under an Indiana testamentary trust, probated and administered there. Three principal questions emerge from this. *First*, is this a civil suit or controversy, United States Const. Art. III, § 2; 28 U.S.C.A. § 1332, rather than a proscribed probate proceeding? Since the estate in question is the remainder subject to several contingencies[1] none of which may occur, is it, *second*, an *actual* controversy in the constitutional sense rather than an academic one; and if so, is it, *third*, one in which, as a discretionary matter, the requested declaratory relief is appropriate?

As we conclude that the case was not, here and at this time, appropriate for declaratory relief, we do not pass on the substantive merits. We think it helpful, however, to discuss them insofar as they show actually what is involved and demonstrate the presently unpredictable contingencies which make the district court's judgment a mere forecast by a Texas Judge on what Indiana Courts might some day do if certain people die in a certain order.

The will was published in 1928. Testator then had two sons, Orin and his younger brother, Clifford, aged 43. Orin was then, and remained to his death, unmarried. Clifford was then married and living in Texas. He had, by that marriage, two daughters, Guinevere (then aged 1) and a sister (then aged 3) who subsequently died before marriage or issue. Clifford now lives in Indiana as does the Trustee. Prior to this first marriage, however, Clifford through a relationship with a domestic on his father's farm became the father of Raymond who was born in 1919. At the time the will was published, Raymond was nine years old. Paternity[2] has apparently never been denied, but not until twenty years

---

[1] At the time of the trial, Raymond was 38, Guinevere was 30, and their father, Clifford, was 72. On the usual mortality tables, the probabilities are, of course, that the children will outlive the father. On the Commissioner's Standard Ordinary table, the expectancies are 30.91, 37.74, and 8.08 years, respectively. If Raymond were to predecease Guinevere and Clifford, the issue would become moot, but the converse is not true. For if Guinevere were to predecease Raymond and Clifford, the right of Raymond to take would remain. The only difference would be that his share would then be 100%, not 50%. We discuss this in detail, *infra*.

[2] Raymond's counsel are careful to point out with candor that for the purposes of this suit they do not claim either that Raymond was a "legitimate" child or that there had been such an acknowledgment of him by his grandfather or Clifford, the father, as to entitle him to take as an heir under any Indiana statutes.

later (1949) did Clifford acknowledge that he was Raymond's father. It was here stipulated that "Raymond was * * the natural son of Clifford * * * " and that the Testator "knew of the existence of Raymond * * *, and knew that he was the son of Clifford * * *, by statements made to him by Clifford * * *."

Testator amassed a substantial estate comprising 100 acres of Indiana farm land and, as reflected by this record, at least $70,000 in securities. It is apparent that he recognized the importance of establishing a definite plan for the disposition of his estate, and, moreover, the specific provision for the welfare of the small group comprising his own immediate family. These desires must have been fully conveyed for the will bears the marks of a careful, articulate, legal draftsman who, except for this one possible situation, used language that is, and has proved to be, a clear direction. The will was in six main items, four of which are immaterial here. Of the remaining two, Item Four, a small educational trust for Guinevere and her sister, subsequently revoked by codicil in 1933, has, for our purposes only an indirect interest. This controversy turns finally on the interpretation of Item Five [3] which established a testamentary trust for the sons, Orin and Clifford, for life with remainder to the surviving children of such sons.

Raymond's argument, put forward with consummate skill, eschews the appearance of resting upon a hypercritical overemphasis of one single word or phrase. On the contrary, the thesis is that because of *three* instances of specific wording, it is clear that for this one and only contingency—Clifford surviving Orin with Orin leaving no issue—the Testator intended to include legitimate as well as illegitimate children of his son Clifford as remaindermen.

In this discussion we use, with no further identification, the numbers we have

3. Because of its importance, we set it out in full. The numbers appearing in brackets [ ] have been added to facilitate a shorthand reference in our discussion:

[1] "I will and desire that said Trustee shall take charge of my entire estate, and if either or both of *my said sons*, Orin Byers or Clifford W. Byers shall desire to live and farm any portion of my farmlands, I will and desire that they shall have that right. After the payment of taxes and other expenses incident to the care of my estate, I will and desire that the income which may be derived from my said estate shall be divided *between my said sons*, and that they shall receive said income in annual, semi-annual or quarterly installments, as shall be to their best interest, keeping in mind the character of the investments of my property, which shall constitute said trust fund. And if it shall be necessary in the proper execution of said trust for changes of investments to be made of said trust funds, I give to said Trustee full power and authority to make such changes of investment as may be necessary to the proper execution of said trust.

[2] "I will and desire that said trust shall continue during the lifetime of *my said two sons*, Orin Byers and Clifford W. Byers. [3] And upon the decease of either of *said sons*, if they shall be survived by *children lawfully begotten of their bodies*, I will and desire that *said children* of *my said sons* shall receive the principal of said trust fund in such proportion that the children of each of *my said sons* shall have and receive onehalf (½) of said entire trust fund, share and share alike.

[4] "In the event that either of *my said sons* should die without leaving *surviving children lawfully begotten of his body*, I will and desire that all of the trust fund shall be kept intact until the decease of my other son, and that then said trust fund shall be divided *among the children* of *said son* who may survive him, share and share alike.

[5] "And if at the time of the decease of either of *my said sons*, the *said deceased son* shall leave surviving *children* lawfully begotten of his body, who are under the age of twenty-one (21) years, I will and desire that said Trustee shall keep the custody of said trust fund until *such child or children of said deceased son* shall reach the age of legal majority, but said Trustee may use the income from that portion of said trust fund to which *my said son* would have been entitled had he survived, for the use, maintenance and education of *said child or children of said deceased son*." (Emphasis supplied.)

inserted in brackets [ ] as reference to the sentence or paragraph of Item Five set out in full in note 3, supra. The contingency which occurred and on which Raymond's claim rests is covered in [4].

Raymond first points out that in all places other than the last phrase of [4], wherever the children of the sons, Orin and Clifford, are referred to, they are identified as "children lawfully begotten of their bodies" [3] or "children lawfully begotten of his body" [4] and [5]. Second, in all other places where subsequent reference is made to a child or children encompassed within the class "lawfully begotten of" the body, the term "child" or "children" is preceded by a definitive description "said" child or "such" child [3], [5]. Third, in all other places where distribution is to be made to two persons [1], the word "between" is used, and properly so, whereas, in the only instance where more than two would exist [4], the word "among" is, and properly so, used.

Adding these three differences together, Raymond sees in this a mosaic, the pieces of which the Grandfather carefully fashioned for use in this isolated contingency. The claim is that in the last clause of [4] the omission of these words or phrases otherwise used was purposeful to reflect the Testator's intent that "children of said son" (Clifford) covers legitimate as well as illegitimate issue.

That the mere existence of these differences is not decisive is immediately recognized by Raymond's counsel who put the problem with rhetorical neatness:

"As we have pointed out, there is undeniably a difference in language. Is there significance in the change of language? Is it merely a mannerism of style by an author seeking to hold a reader's interest by variety of expression? Is it an accidental substitution of words caused by a pedantic pride in prolixity? Or is

it a deliberate intention by a departure from repeated diction to express a different desire and testamentary disposition without openly condoning the moral wrong which had its inception in his own farm home between his son and his servant?"

To this the District Judge answered that Raymond was not included as a remainderman in [4] or elsewhere in the trust. Our answer is that no answer should have been made.

■ At the outset we think that with respect to the first of the procedural-jurisdictional inquiries, the action was a civil suit or controversy and was not a proscribed probate proceeding. The suit did not attack the will. It affirmed its validity and sought only a construction of its written terms. To the fact, there present and deemed significant in Looney v. Capital Nat. Bank, 5 Cir., 235 F.2d 436, that Texas had enacted the Uniform Declaratory Judgment Act, Tex.Rev.Civ. Stat.Ann. (Vernon), Art. 2524–1, §§ 1–16, can be added the further one that Indiana [4] likewise has that Act and, again like Texas, lodges jurisdiction for the construction of wills and trusts in the Circuit Courts, its court of general jurisdiction. Were the parties litigating in Indiana, it would, then, be by action in a court of general jurisdiction and not a probate or similar special tribunal.

■ Heeding always the counsel that decision on constitutional questions should be avoided if at all possible, Siler v. Louisville & N. R. Co., 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753, 758; Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979, we need not determine whether the remote, contingent or hypothetical nature of the questions presented by this suit are of that character as to make it not a "case" or "controversy" within the constitutional sense.

4. Burns' Ind.Stat.Ann. §§ 3–1101 to 3–1116.
Probate courts have been established in one or two large metropolitan areas. Where this has been done, such courts

have jurisdiction to construe a will, Burns' Ind.Stat.Ann. § 4–2910, but generally this is a matter for the Circuit Courts, Burns' Ind.Stat.Ann. § 6–605.

Since, "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 828, our effort to analyze it from this point of view could hardly add workable guides. The difficulties inherent in this have already been aptly described: "If its metes and bounds are not clearly marked, it is because * * * available verbal markers are themselves elastic, inconstant and imprecise." Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 242, 73 S.Ct. 236, 240, 97 L.Ed. 291, 295. And any such effort might unintentionally serve to thwart or circumscribe unduly the use and development of this great procedural device. Certainly this seems to be the approach of the Supreme Court where, with some frequency, it orders dismissal of the declaratory judgment suit because the remedy is inappropriate, rather than wanting in constitutional power as such. Public Service Commission of Utah v. Wycoff Co., supra; Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; Eccles v. Peoples Bank, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784; Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407; International Longshoremen's and Warehousemen's Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650; Public Utilities Commission of State of California v. United Air Lines, 346 U.S. 402, 74 S.Ct. 151, 98 L.Ed. 140; cf. Brillhart v. Excess Insurance Co., 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620, 1628.

But to assume *arguendo* that the suit is within the constitutional limits does not at all compel a court to grant declaratory relief. There may yet be a question whether it is within the Act and whether the total circumstances are such that the remedy ought properly to be used. What is such a case or what are such circumstances can hardly be blueprinted. About Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, the Court later said: "Mr. Chief Justice Hughes used the whole catalogue of familiar phrases to define and delimit the measure of this new remedy. If its metes and bounds are not clearly marked, it is because his available verbal markers are themselves elastic, inconstant and imprecise. It applies, he points out, only to 'cases and controversies in the constitutional sense' of a nature 'consonant with the exercise of the judicial function' and 'appropriate for judicial determination.' Each must present a 'justiciable controversy' as distinguished from 'a difference or a dispute of a hypothetical or abstract character * * *.' The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' The relief is available only for a 'concrete case admitting of an immediate and definitive determination of the legal rights of the parties.'" Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, at page 242, 73 S.Ct. 236, at page 239, 97 L.Ed. 291, at page 295. This is not a guide for automatic self-application for the Court goes on to state, "But when all of the axioms have been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." Id., 344 U.S. at page 243, 73 S.Ct. at page 240, 97 L.Ed. at page 296.

Considerations of such subtlety have of necessity brought into play the principle that "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of

judicial discretion,[5] exercised in the public interest." Eccles v. Peoples Bank, 333 U.S. 431, 68 S.Ct. 644, 92 L.Ed. 789.

Factors to be taken into account would include whether the situation has "matured to a point where we can see what, if any, concrete controversy will develop," Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 245, 73 S.Ct. 236, 97 L.Ed. 291, 297. Also "It is * * the duty of a court * * * to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief." Eccles v. Peoples Bank, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784, 789. Declaratory relief should be granted only " * * * where the interests of justice will be advanced and an adequate and effective judgment may be rendered." Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 462, 65 S.Ct. 1384, 1390, 89 L.Ed. 1725, 1735. "While the courts should not be reluctant or niggardly in granting this relief in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions * * *. The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 243, 73 S.Ct. 236, 240, 97 L.Ed. 291, 296.

■ In analyzing the problem presented here, we should be especially mindful that words may have a double meaning. Careful regard to context is therefore essential. For example, our decision is not really aided by the technical description given to the future interest which the grandchildren have under the testamentary trust. It is not contingent in the sense either that identity or the event upon which it comes into being is unknown. In this sense it is probably vested. But it is subject to the contingency of being defeated as to any member of the class who might predecease the life tenant.

Consequently we must look upon this in terms of actualities. This should encompass not alone events and their effect on the decision, but the effectiveness of any declaratory decision which might be granted.

In this light there is nothing but the sheerest speculation whether that state of facts will come about in which Raymond, vis-a-vis Guinevere, has any interest whatsoever even if it is assumed that his construction of the will is correct.

If Clifford were to predecease both Raymond and Guinevere, the controversy would exist between the two of them. If Guinevere died first, followed next by Clifford leaving Raymond surviving, his asserted interest would be, not 50%, but rather 100%. However, on that supposition, he would have no claim whatsoever against Guinevere (or her estate) since she never took. If Raymond were to die first, no claim would arise. And if Guinevere died first, followed by Raymond, no question would arise. In this class of three persons, there are six possibilities (not counting simultaneous death of two or three) as to the order in which each might die, and in only two

5. Recognition of this principle and its decisive application from time to time as the justice of a given case required, Employers' Liability Assurance Corp. v. Mitchell, 5 Cir., 211 F.2d 441; Western Assurance Co. v. Simmons, 5 Cir., 189 F. 2d 112, has not kept us from giving full and effective voice to the remarkable instrument of declaratory relief. In an early case, Pennsylvania Casualty Co. v. Upchurch, 5 Cir., 139 F.2d 892, frequently cited by others (See, e. g., Ameri-can Machine & Metals, Inc., v. De Bothezat Impeller Co., 2 Cir., 166 F.2d 535, in turn approved by us in Schantz), and in Hardware Mutual Casualty Co. v. Schantz, 5 Cir., 178 F.2d 779, 780, we declined to treat contingent as a shibboleth, "It is settled that where there is an actual controversy over rights * *, whether contingent or liquidated, a declaratory judgment may be rendered * * *."

out of that six, can the issue presented here arise as between Guinevere and Raymond.[6]

While life expectancy tables, note 1, supra, obviously indicate a probability that one of the age (30) of Guinevere will survive one the age (38) of Raymond who would in turn survive one the age (72) of Clifford, we know that these are averages based on a large group. We need not engage in fictions of the sort that death alone terminates the possibility of parenthood, see United States v. Provident Trust Co., 291 U.S. 272, 283, 54 S.Ct. 389, 78 L.Ed. 793, 796, to recognize that persons aged 72 may, and now do, frequently live for many, many years.[7] During each year that Clifford lives, Guinevere or Raymond, or both, are exposed to all of those vicissitudes of our modern dangerous world in which life may be snuffed out at an early time by new or strange maladies or the traumatic injuries of peace or war.

For this to be a live question for Raymond, Raymond must stay alive. He must outlive his father, and if he is to have a live controversy with his sister— his only adversary here—he must live as long as she. There is no assurance at all that at the critical moment Clifford dies —without which the estate does not come into being—which one, if either, of the grandchildren will be alive. This means that a court has been asked to make, and as here made, a declaration on the legal consequences which flow from an event which may never take place.

Even more significant, the parties to this suit are such that declaratory relief has only limited effectiveness. On the agreed facts showing only Raymond and Guinevere as possible grandchildren, the District Court declared, in effect, that Guinevere would alone take. But as to whom does this order apply? Who is bound by it? Raymond is the only adverse party. Suppose an Indiana lawyer persuades the Indiana Executor-Trustee that the Texas Judge's reading of the Indiana will was wrong. Can Guinevere take her Texas decree to Indiana? On it could the Executor-Trustee be compelled at Guinevere's instance to deliver to her the remainder estate? Suppose, on application of the Executor-Trustee an Indiana Court would rule that Raymond was entitled to take under the testamentary trust and, without affirmative action on Raymond's part to obtain one-half, the Indiana Court, by a decree of distribution to him, in effect *ordered* him to take. Would he then be in contempt of a court situated a thousand miles away?

That any relief as between these two, no matter which way the Texas decision goes, is purely artificial without a decree

6. Using C, R, and G to represent Clifford, Raymond and Guinevere, respectively, the three principal alternatives are as follows:

    I.  C dies, R & G survive = controversy exists
   II.  R dies, C & G survive = 0
 III.  G dies, C & R survive = R could get 100%

The following table shows, however, the alternative possibilities as death occurs in the order (1), (2), (3):

| (1) | (2) | (3) | |
|---|---|---|---|
| C | R | G | Claim for 50% each |
| C | G | R | Claim for 50% each |
| R | C | G | No possible question |
| G | C | R | No controversy with Guinevere |
| R | G | C | No possible question |
| G | R | C | No possible question |

7. In 1956, out of a total population of 168,091,000, there were 4,847,000 aged 75 years and over in the United States. Statistical Abstract of the United States, 1957, Table No. 20, page 24, Department of Commerce, Bureau of The Census; current population reports, Series P-25, No. 146.

binding on the Executor-Trustee is graphically portrayed by assuming that we would reverse and make the declaration in Raymond's favor. Of what use would it be to him? He could get nothing from Guinevere as she has nothing until the contingency (Clifford's death) occurs and she is somehow accorded dominion over the remainder estate. If, at that time she did not have possession, could he compel her to go to Indiana to assert whatever was necessary to assure him a one-half interest? On it Raymond could get nothing from the estate. Unless he could persuade the Executor-Trustee, he would require court assistance from an Indiana court and if, at his instance (or hers acting vicariously for Raymond pursuant to the coercion of the Texas decree), the Indiana court held against him (and thus in Guinevere's favor) on what basis in equity and good conscience could he use his Texas decree to compel her to give up what the Indiana court said was hers, not his?

Nor does this record reflect any necessity for a declaration, ineffectual as it must be, at this time. There was no effort to show that Raymond's contingent-contingent remainder had any present actual money value, or that he was at this time suffering any loss or any inability to exploit its economic value (by loan, or sale, or pledge, or otherwise) because of the contention Guinevere (not the Executor-Trustee) was making. And if there were, a decree forbidding Guinevere from making such contentions while the non-party Executor-Trustee was still free to do so, would hardly have any value or meet any necessity.

All that could be accomplished by the suit was an implied holding on the basis of the agreed stipulation that Raymond was the natural son of Clifford. But even there, on his asserted construction of the will, his right to take under the trust does not depend on his satisfying Guinevere that this is so, but upon establishing to the satisfaction of the Executor-Trustee or any appropriate Indiana court that this is so. A Texas declaration is neither helpful nor necessary. For if, as suggested on the argument, there may be doubts or difficulties if this is postponed until Clifford's death, the obvious thing for Raymond to do is to take whatever steps are needed to establish paternity in Indiana where he, his mother and father, and the Executor-Trustee, live.

We cannot see why this same approach is not feasible as to the main underlying question. Raymond and the Executor-Trustee reside in Indiana where a suit can be filed. If under Indiana principles, it is necessary to have some character of jurisdiction over the person of Guinevere insofar as the suit puts in jeopardy her interest in excess of her acknowledged 50% interest, there would certainly seem to be means [8] to accomplish this at Clifford's death, if not before. And if, in case that were not available, after obtaining an Indiana court decision on the construction of the will in his favor, a new declaratory action could be commenced against Guinevere if still living in Texas, and the Indiana decision would, we would think, be stare decisis.

8. The Indiana courts clearly have jurisdiction over the trust property because of its physical presence within the state and may therefore adjudicate title after service by publication. Such service is permitted "Where the defendant is not a resident of the state, and the cause of action is * * * to try or determine, or quiet the title to, or possession of, real estate or any interest therein." Burns' Ind.Stat.Ann. § 2–807. See also Id., § 6–606. In such proceeding there would be a binding determination which would likely foreclose further inquiry as to the personalty (bonds and securities) even though these might not be reached directly by the proceedings to quiet title to realty. In any case, if this were not subject to similar state proceedings, or not incidentally foreclosed, the issue might be the subject of an interpleader filed by the Executor-Trustee under 28 U.S.C.A. §§ 1335, 2361 in a Federal Court in Indiana.

We have expressly refrained from attempting to set forth the circumstances under which actions, either by traditional equitable proceedings, or by the more flexible device of declaratory relief, can be filed by one owning or claiming to own a future interest subject to contingencies. That the principles seem to be of universal application here and in England seems demonstrated by the detailed annotation, Declaratory Relief-Future Interest, 174 A.L.R. 880. In the 65 pages of this annotation, hundreds of cases from the Federal Courts and all the states are abstracted. Of the many cases there digested, those in which the facts were comparable to these, i. e., those in which there was no demonstrated present necessity for a declaration, parties whose presence was necessary for the declaration to be effective were not before the court and no certainty existed that the events involved would occur, denied the relief. In none was relief granted. To these may be added the following in which like considerations have led these courts to decline the requested declaration. Staley v. Safe Deposit & Trust Co. of Baltimore, 189 Md. 447, 56 A.2d 144 (a Maryland Court undertook to declare rights under an Illinois trust concerning an Arizona remainderman during lifetime of life tenant, the court reversed); Anderson v. Dimick, Fla., 77 So.2d 867 (declaration whether the adopted child of the life tenant could qualify as a remainderman was refused during the lifetime of the life tenant); Munger v. Richards, Tex.Civ.App., 87 S.W.2d 797 (error ref. n. r. e.); Lanston v. Children's Hospital, 80 U.S.App.D.C. 86, 148 F.2d 689; Stephenson v. Stephenson, D.C.Wis., 148 F.Supp. 290; Flanigan v. Security-First National Bank, D.C.Cal., 41 F.Supp. 77; Williams v. Virginia Military Institute, 91 U.S.App. D.C. 206, 198 F.2d 980, 981; cf. Suni-Citrus Products Co. v. Vincent, 5 Cir., 170 F.2d 850, 853.

As we are enjoined that "Whether declaratory relief is appropriate under the circumstances of * * * [the] case [is an] * * * inquiry * * which every grant of this remedy must survive," Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 239, 97 L.Ed. 291, 294, we conclude that in this setting at this time declaratory relief either sought or granted was inappropriate. The result is that the judgment is vacated and the cause is remanded to the District Court with directions to dismiss the complaint without prejudice. International Longshoremen's and Warehousemen's Union v. Boyd, 347 U.S. 222, 224, 74 S.Ct. 447, 98 L.Ed. 650, 652; Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 301, 63 S.Ct. 1070, 87 L.Ed. 1407, 1413.

Judgment vacated and remanded with directions.

JONES, Circuit Judge.

I concur in the result.