AMERICAN FIDELITY & CASUALTY COMPANY, Inc., Appellant,

v.

PENNSYLVANIA THRESHERMEN & FARMERS' MUTUAL CASUALTY INSURANCE COMPANY et al., Appellees.

No. 18074.

United States Court of Appeals Fifth Circuit.

July 6, 1960.

454

S. F. Memory, Jr., Waycross, Ga., J. Mack Barnes, Waycross, Ga., S. F. Memory, Blackshear, Ga., for appellant; Memory, Barnes & Memory, Waycross, Ga., of counsel.

Larry E. Pedrick, Waycross, Ga., J. H. Highsmith, Baxley, Ga., Milton P. Fields, Rocky Mount, N. C., for Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. and Cargocare Transp. Co., Inc., appellees; Bennett, Pedrick & Bennett, Waycross, Ga., of counsel.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is another, and undoubtedly not the last, of those cases of which we have many,[1] in which one insurer having the good fortune to find some other insurer who has written a policy for someone else attempts to engraft itself upon the contract to which it was not a party in the hopes that what it bound itself to do, it need not perform. The result, if successful, is that its contractee, the assured, must look elsewhere for the promised protection.

Streamlining the facts greatly simplifies the problem.[2] Clay was a certificated motor carrier owning a fleet of tractor-trailer units. American was its insurer under a fleet policy. Britt was likewise a certificated motor carrier. Pennsylvania was insurer for Britt under a similar fleet policy. To accomplish an interstate carriage of tobacco for one of its shippers, Britt leased a unit complete with driver from Clay. While the Clay truck, driven by Clay's general employee, the Driver, was engaged on its interstate voyage, the truck developed mechanical trouble at nighttime. The Driver stopped the truck on a Georgia highway. As thus stopped, without placing out warning flares which were available but not used, the truck partially blocked the highway. A passenger car, whose operator was unaware of the presence of this unlighted truck, smashed into its rear end causing serious injuries to the occupants. Suits were filed by the Damage Plaintiffs against Clay, and later by amendment, against Britt as well. After removal from the state court these damage suits were pending in the Southern District of Georgia at the time the instant cause for declaratory relief was filed in that court.

Clay, at the instigation of American, made formal written demand on Britt and Pennsylvania that they assume the defense of the damage suits then pending against Clay only. Britt and Pennsylvania declined. To avoid defaults, American, for Clay, in Clay's name, thereupon filed answers in the suits of the Damage Plaintiffs.

But the parties had scarcely begun to litigate. Now to that relatively simple tort claim which long ago could have been tried, settled or disposed of, comes action which turned this into a many-sided Donnybrook. For American, defending Clay and supplying it legal counsel in resisting the suits by the Damage Plaintiffs, now turned on its assured and

---

1. American Fidelity & Casualty Co. v. St. Paul-Mercury Indemnity Co., 5 Cir., 1957, 248 F.2d 509; Maryland Casualty Co. v. Southern Farm Bureau Casualty Ins. Co., 5 Cir., 1956, 235 F.2d 679; United Services Automobile Ass'n v. Russom, 5 Cir., 1957, 241 F.2d 296; General Insurance Co. of America v. Western Fire & Casualty Co., 5 Cir., 1957, 241 F 2d 289; Continental Casualty Co. v. Suttonfield, 5 Cir., 1956, 236 F.2d 433; Factory Mutual Liability Co. v. Continental Casualty Co., 5 Cir., 1959, 267 F.2d 818; Wright v. Southern Farm Bureau Cas. Ins. Co., 5 Cir., 1960, 279 F.2d 363.

2. These abbreviations identify:
   Clay:   Clay's Transfer Company, Inc., a North Carolina corporation
   Britt:  Britt Transportation Company, Inc., a North Carolina corporation
   American: American Fidelity & Casualty Company, Inc., a Virginia corporation; Coverage A Limits $50,000/500,000
   Pennsylvania: Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Company, a Pennsylvania corporation; Coverage A Limits $100,000/200,000
   Damage Plaintiffs:
     Halligan: injuries, $25,000
     Sloss:    injuries, $250,000
     Smith:    injuries, $25,000

filed this action for declaratory judgment. In it American sued everybody. It sued its own assured Clay. Likewise it sued Britt and Pennsylvania and all of the Damage Plaintiffs.

The refrain of American's complaint was the familiar one: Clay does not have the protection which it thought it bought and paid for, but Clay need not worry since Britt was thoughtful enough to procure insurance and Pennsylvania would take care of Clay as well. The only thing wrong with this was that Pennsylvania agreed only part way—it agreed with Clay that American owed Clay a defense. But it disagreed that Pennsylvania ever would. Clay, the sole victim of these magnanimous assurances, stood alone and helpless in the middle, and had to retain counsel for the preservation of its rights. Catching the spirit of this Kilkenny Fair in which all lash out against one another, it is not sur-

prising that Clay's private counsel, nominally an appellee, now takes on the role of partial ally of American to urge that coverage of Pennsylvania, as well as American, attaches to increase Clay's Coverage A protection limits from $50,000 to $150,000 as to any one person.[3]

American's objective was based upon the provisions found in both policies,[4] the mutual reciprocal operation of which, so it contended, would make the Pennsylvania policy *primary*, and the American policy *excess*. The practical effect was that American would not be called on to pay claims until the dollar limits of the Pennsylvania policy were first exhausted. In brief the policy construction-application theory of American was this. Britt's Pennsylvania policy automatically insured the owner-lessor (Clay) of any truck leased to Britt just as Clay's American policy automatically extended to the lessee-user (Britt).[5] The big dif-

---

3. American limits any one person      $ 50,000
   Pennsylvania limits any one person      100,000
   
   —————
   
   $150,000

4. Each policy contained a "Receipts Basis-Truckmen (Form B)" endorsement for a Comprehensive Automobile policy.

5. The endorsement, note 4, supra, first defined "hired automobiles." Subparagraph "6(b) 'Hired Automobile' means an automobile used under contract in behalf of, or loaned to, the named insured except (1) an automobile owned by or registered in the name of the named insured * * *."

The extended insurance was prescribed in these terms.

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability * * * applies with respect to all owned and hired automobiles of the commercial type, subject to the following provisions:

"1. Definition of Insured. As respects such insurance, insuring Agreement III, Definition of Insured, is replaced by the following:

"With respect to the insurance for Bodily Injury Liability * * * the unqualified word, 'insured' includes the named insured and also includes any person while using an owned automobile

or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. The insurance with respect to any person or organization other than the named insured does not apply:

"(a) except with respect to an employee of the named insured, to any person or organization, or to any agent or employee thereof, engaged in the business of transporting property by automobile for the named insured or for others (1) unless the accident occurs while such automobile is being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority, * * *.

*  *  *

"(d) with respect to any hired automobile, to the owner or any lessee of such automobile, or to any agent or employee of such owner or lessee, if the accident occurs (1) while such automobile is not being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority, or (2) after arrival of the automobile at its destination under a single-trip contract which does not provide in writing for the return trip of the automobile; *  *  *."

ference *came* in the operation of the "other insurance" clause of the endorsement.[6] The "other insurance" clause covers two situations apparently in recognition of the fact that the basic coverage as thus automatically extended is expected to cover trucks (a) leased *to* the named insured from others and (b) trucks leased *by* the named insured *to* others. As to trucks (a) leased *to* the named insured, the insurance is pro rata with all other available insurance. But as to trucks (b) leased *by* the named insured *to* others, the insurance is to be excess over valid and collectible insurance.

Reducing this to more tangible (and perhaps understandable) terms, this is the way American's analytical process works. Clay is an additional insured under the Pennsylvania policy (see note 5, supra) so that coverage extends to Clay. Ordinarily, this would be borne pro rata since "the insured [Clay] has other insurance," (see note 6, supra) i. e., with American. But American's hired vehicle coverage of Clay insofar as it relates "to any automobile of the commercial type while leased or loaned to any person or organization, *other than* the *named insured,*" is only "excess insurance over any other valid and collectible insurance." Thus Clay has no "other insurance against a loss covered by this [Pennsylvania] policy." Consequently Pennsylvania is liable and there can be no pro rata apportionment.

The District Court never got to the point of determining whether this analysis by American was correct. On the motion of defendants Britt and Pennsylvania, it dismissed the complaint, but without prejudice, on two grounds. First, there was no real controversy between Clay and American, and on realignment of the parties this put Clay, a North Carolina citizen, suing Britt, also a North Carolina citizen. Second, the Court in its discretion considered declaratory relief not appropriate especially since many of the underlying questions would be litigated in the suits by the Damage Plaintiffs. We affirm.

We think it unsound to rest affirmance on lack of diversity jurisdiction. For reasons we later outline, we think that there can be no possible basis for American's denial of its contractual duty of defense. Consequently, it had no right to tell Clay that there was no duty to defend, or that Clay should go elsewhere for the time being. But the fact is that it did so. So much has it done so, that Clay has been required to incur the expense of counsel to secure what the contract plainly called for. There was a real, but legally baseless, controversy between American and Clay. It was not the case of the two joining up against Pennsylvania or Britt or both.[7]

But we think there was more than ample ground for the exercise of discretion in declining declaratory relief as sought, in the time and manner in which it was sought.

The damage suits had never been tried. No one had yet paid or become legally liable to pay. Whether anything will be

---

6. The endorsement, note 4, supra, provided:

"7. Other Insurance. If the insured has other insurance against a loss covered by this policy the company shall not be liable for [a] a greater portion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, [b] with respect to any automobile of the commercial type while leased or loaned to any person or organization, other than the named insured, engaged in the business of transporting property

by automobile for others, the insurance shall be excess insurance over any other valid and collectible insurance."

7. The District Court relied upon Maryland Casualty Co. v. Boyle, 4 Cir., 1941, 123 F.2d 558, 562; State Farm Mutual Automobile Ins. Co. v. Hugee, 4 Cir., 1940, 115 F.2d 298, 301, 132 A.L.R. 188; American Fidelity & Casualty Co. v. Service Oil, 4 Cir., 1947, 164 F.2d 478; City of Indianapolis v. Chase National Bank, 1941, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47; Ermentrout v. Commonwealth Oil Co., 5 Cir., 1955, 220 F.2d 527, 530; Farr v. Detroit Trust Co., 6 Cir., 1941, 116 F.2d 807, 811.

paid or be legally payable, no one, on this record, yet knows. All that was presented was a question of the defense of these damage suits. American sought a declaration that since, under the unique cross-pollination of the reciprocal-exclusionary incidence of the "other insurance" clause, note 6, supra, it was merely an "excess" insurer, its duty to *defend*, like the obligation to *pay*, was excess also.

This is a complete misconception of the nature of the insurer's obligation. It is one the District Court rightly rejected. Once rejected, there was really nothing else presented requiring authoritative direction or resolution. American's policy is something much more than merely to *pay*.[8] The obligations set forth in "Insuring Agreements" Part I to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of" injury to persons, are not all. In Part II "Defense, Settlement, Supplementary Payments," American, with respect to claims arising under coverage A, made the absolute undertaking to "(a) defend any suit against the insured alleging such injury * * * or destruction and seeking damages on account thereof, even if such suit is groundless, or false or fraudulent * * *." This part further expressly recognized that the obligation to furnish and pay for such defense is above and beyond the payment of the loss, whether by settlement or judgment. As to it the policy continues "the amounts incurred under this insuring agreement

* * * are payable by the company in addition to the applicable limit of liability of this policy."

The obligation to defend is distinct and separate. It is not the less so merely because care is required in the interpretation and application of such an approach. The two are, of course, related in the sense that if the occurrence set forth in the plaintiff's claim is one for which, after a trial and judgment for the damage claimant against the assured, there would be no liability under the policy to pay the claim, no duty to defend ever arose. But they are separate and distinct in the sense that the duty to defend does not depend upon the payment to a damage claimant or the rendition of a judgment declaring the assured's legal obligation to pay. Indeed, the purpose of the defense is—or was at one time and occasionally may still be hoped for—to win. To win means to defeat the claim so that the *amount* of payment is a question never reached. The effect of the policy is that the insurer undertakes to defend claims of the type for which it would have to make payment. And in the event the defense is not successful, or the making of it is fraught with risks which make compromise desirable, it undertakes to pay up to the maximum amount prescribed. The limitations on the dollars payable under the liability coverage operate as a ceiling and not, unless otherwise specified, as a condition precedent to defend or an exclusion (deduction) of the cost of defense from the policy limits.[9]

---

8. 8 Appleman, Insurance Law and Practice, § 4685 at 21–22 (1942).

" * * * [T]he insurer's duty is both to defend actions *and* to pay judgments obtained against the insured. Otherwise, where the damages exceed the policy coverage, the insurer could walk into court, toss the amount of the policy on the table, and blithely inform the insured that the rest was up to him. This would obviously constitute a breach of the insurer's contract to defend actions against the insured, for which premiums had been paid, and should not be tolerated by the courts."

9. See the comprehensive treatment in 8 Appleman, Insurance Law and Practice, §§ 4682, 4683, 4684, 4685(a), 4898 and 4900 (1942). That Georgia courts make the significant distinction between suits which are clearly not within the policy coverage, e. g. Morgan v. New York Casualty Co., 1936, 54 Ga.App. 620, 188 S.E. 581, and those suits which, if the facts alleged were true, could result in coverage, e. g. Liberty Mutual Ins. Co. v. Atlantic Coast Line R. Co., 1942, 66 Ga. App. 826, 19 S.E.2d 377, even though in the particular case the facts alleged are not true, i. e. baseless, fraudulent or false.

■■ Here there is no question that the claims asserted by the Damage Plaintiffs are ones within Coverage A of Part I. American does not dispute this, nor could it after having undertaken the defense—the filing of answers for Clay through counsel furnished by American. Both on the underlying facts revealed by the investigations and on the pleadings filed by the Damage Claimants, these were suits "against the insured alleging * * * injury * * * seeking damages on account" of "bodily injury * * * sustained by [a] person, caused by accident and arising out of the ownership, maintenance or use of the automobile" by Clay, the insured. That investigation or defense of these suits whether "groundless, false or fraudulent," may fortuitously uncover a potential third party defendant or the existence of some party unrelated to Clay and American who has, by some contract to which they are not a party, undertaken to provide protection to another, does not alter or modify in any way the nature of the claim or the obligation to defend it.[10] All that such fortuitous developments can affect is the amount of payment, if cast for liability, or the momentary or final source of funds for settlement or satisfaction of judgments if needed.

■ There are several reasons for this. The "other insurance" clause, see note 6, supra, does not refer to defense. The reference in that clause to pro rata or excess insurance relates to the payment of "such loss." This is made clear by the reference to the "applicable limit of liability stated in the declarations" of the several policies. Such limitations, we pointed out above, have no bearing on the cost of defense or the duty to supply it.

More important, the duty to defend is one which is personal to the relationship of this insurer and this assured. Whatever may be the right ultimately to saddle off a part of the cost of defense actually undertaken once payment has been made and a right comparable to subrogation is being asserted,[11] it is contrary

---

10. So much is this so in the Georgia view that an assured may get attorney's fees on attorney's fees. An assured who has been compelled to conduct his own defense in a case in which the insurer had a duty to defend may recover the cost of the defense (attorney's fees, etc.) incured, and a bad faith (or stubborn, litigious) refusal to defend is the basis for an additional recovery for attorney's fees incurred by the insured in asserting his right of reimbursement against the insurer. See Maryland Casualty Co. v. Sammons, 1940, 63 Ga.App. 323, 11 S.E. 2d 89; Milwaukee Mechanics Ins. Co. v. Davis, 5 Cir., 1952, 198 F.2d 441; Liberty Mutual Ins. Co. v. Atlantic Coast Line R., 1942, 66 Ga.App. 826, 19 S.E.2d 377. A refusal of an insurer to defend a suit ostensibly within the coverage of the policy was sufficient to raise a jury question as to whether the refusal was in bad faith under the Georgia statute. Liberty Mutual Ins. Co. v. Atlantic Coast Line R., supra. Any frivolous or unfounded refusal to pay or furnish a defense constitutes bad faith within the Georgia statute. American Casualty Co. v. Callaway, 1947, 75 Ga.App. 799, 44 S.E.2d 400; Continental Casualty Co. v. Owen, 1954, 90 Ga.App. 200, 82 S.E.2d 742; see also 8 Appleman, supra, §§ 4898, 4900.

11. Some cases, after *payment* by one insurer, do allow recovery from another insurer of all or a part of the costs of defense. Of these are such cases as Bituminous Casualty Corp. v. Travelers Ins. Co., D.C.D.Minn., 1954, 122 F.Supp. 197; Oregon Auto Ins. Co. v. United States Fidelity & Guaranty Co., 9 Cir., 1952, 195 F.2d 958; Continental Casualty Co. v. Buckeye Union Casualty Co., Ohio Com.Pl.1957, 143 N.E.2d 169; American Surety Co. of New York v. Canal Ins. Co., 4 Cir., 1958, 258 F.2d 934. But some authorities in automobile insurance law seriously question these cases as a matter of policy-contract-construction and think the sounder rule is that applied in Financial Indemnity Co. v. Colonial Insurance Co., 1955, 132 Cal. App.2d 207, 281 P.2d 883. 8 Appleman, Insurance Law and Practice § 4691 at 24 (1960 Supp.) cites this as a "recent decision [which] supports the text on the ground that the duty to defend is personal to the particular insurer and it is not entitled to divide that duty with or require contribution from the other." Risjord & Austin, Automobile Liability Insurance Cases, in their abstract of that decision (case 348) concur. And in their comments to the four cases first cited (abstracted as cases 157 [Bituminous Cas.

to the very nature of the contract that the insurer can scout around in the hopes that it can find someone whose defense the assured is compelled to accept.

To provide in the policy that the dollar amount of the loss ultimately payable may turn on the availability of other *valid* and *collectible* insurance is one thing. Apart from these vexatious complications which leave the assured so long uncertain—if not uninsured—the assured does not suffer from such provisions since the underwriter is released only by the collectibility of the loss from another source. This relates to money only, and then only to the extent that it is available elsewhere. But it is quite a different matter—in the absence of clear language compelling such a result—to construe the policy to allow the insurer to step aside and abdicate its important role of defender and thereby impose upon its assured a company unknown and unrelated to the assured. The financial responsibility, the business and moral integrity and reputation of the insurer, the practices followed by it in the defense of claims, the kind and reliability of the counsel it employs or who will work for it—all these and many others are factors relevant to the conscious choice made by the assured as it selects the company with which it will deal. Such matters are of great importance and can affect both the reputation of a business and its pocketbook. An assured entrusts much to the insurer when it commits the defense of claims to counsel selected by the underwriter. It is scarcely reasonable to think that responsible business men would leave the ultimate selection of the ultimate counsel to the fortuitous availability of a contract made between another insurer and some other person. Even more foolhardy would it be to leave to such unknown and unascertainable counsel the delicate decisions to try, or not to try, to settle or not to settle, as they might bear on the good will of the business or its bank account.[12]

Unlike so many complaints which are as vague as the Federal Rules permit, the one filed by American spelled it all out. It could readily have been treated under F.R.Civ.P. 12(c) and 56, 28 U.S.C.A., for summary judgment on this point. But this mechanism was not required since on the face of all of the uncontrovertible facts asserted with supporting exhibits annexed,[13] it was clear that American had no right whatsoever to an order declaring that Pennsylvania should assume—and Clay should submit to—the defense of the suit by the Damage Plaintiffs against Clay growing out of the operation of a truck covered under American's policy. Consequently, it did not state a claim for which that relief could be granted. Dismissal was in order.

v. Tavelers], 558 [Oregon Auto Insurance Co. v. United States F. & G.], 1463 [Continental Casualty Co. v. Buckeye] and 1542 [American Surety v. Canal]), they point out that while the result appears to be "equitable," the cost of defense is not a "loss" which, under "other insurance" clauses, is the sole subject of apportionment.

12. Today's spectacular verdicts make the possibility of a recovery by damage claimants substantially in excess of policy limits something much more than an academic fear. When that happens there is little comfort in a possible recovery of the excess by the assured from the insurer. Whether the standard is negligence or good faith in the conduct of defense including settlement, see, e. g., American Fidelity & Casualty Co. v. Greyhound Corp., 5 Cir., 232 F.2d 89; Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App.1929, 15 S.W.2d 544; Linkenhoger v. American Fidelity & Cas. Co., 1953, 152 Tex. 534, 260 S.W.2d 884; United Service Automobile Ass'n v. Russom, 5 Cir., 1957, 241 F.2d 296; Fidelity & Casualty Co. of N. Y. v. Robb, 5 Cir., 1959, 267 F.2d 473; Dye, Insurer's Liaility for Judgments Exceeding Policy Limits, 38 Texas L.Rev. 233 (1959), the assured at best has a second lawsuit with the hope of recovery, and at worst the loss of this one too. This imminent likelihood demonstrates that the assured commits much to the reliability and judgment of the insurer.

13. These included the policies of both American and Pennsylvania, copies of the complaints filed by the Damage Plaintiffs and the letter demands of Clay on Britt and Pennsylvania.

■ Once that was out of the way, what remained? There was the prayer by American that the Court declare that Pennsylvania should, at least up to the dollar limits of its policy, pay any judgments which might be rendered. Unlike the demand to take over the defense—which while groundless was a real and present controversy—this request sought a declaration on a matter which might never arise. For all we know if and when American and Pennsylvania get in and give the defense to Clay and Britt as their respective policies so clearly demand, the suits might be defeated. Or as between Clay and Britt there might be evidence on ownership, control and direction of the truck or its driver which allows one but not the other to escape. Or in the development of the substantive causes of action by the Damage Plaintiffs, evidence might be relevant and adduced which has a decisive bearing on the status of the truck as a hired or owned vehicle as the two policies use that and related terms.

■ What we are saying is that *if* each of the Damage Plaintiffs win, *if* neither of the defendants Clay or Britt succeed, *if* facts are not developed requiring or permitting decisive findings, express or implied, on the status of the truck or its driver as they might bear upon related provisions of the two insurance policies, problems now academic may then be actual. These might include the question whether Pennsylvania has primary and American excess coverage, whether both are liable pro rata, or at all, or whether either, short of payment and a standing growing out of subrogation, either equitable or conventional, may fasten itself upon the other's contract as a sort of ubiquitous third party beneficiary.[14] But it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass. The mandatory obligation of a District Court to accept and determine a suit for declaratory relief is not commensurate with the full scope of a "case or controversy" within the constitutional sense. Byers v. Byers, 5 Cir., 1958, 254 F.2d 205, 209–210; Public Service Commission of Utah v. Wycoff Co., 1952, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291; Alabama State Federation of Labor v. McAdory, 1945, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; Eccles v. Peoples Bank, 1948, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784.

There was one real problem presented: did American owe Clay a defense? The answer was patent and was impliedly stated by the Court's dismissal. We have spelled it out in no uncertain terms. To this extent the trial court's action and our affirmance is an effective declaration of right and duty. See 20 Appleman, supra, § 11354. The rest of the asserted controversy may never be, but when it is or what it is when it is, a proper court can then resolve those tangible controversies as the case might require. The District Court was careful to make his dismissal without prejudice to those further rights, and it was well within its considered judicial discretion to decline to express legal opinions on academic theoreticals which might never come to pass.

Affirmed.

JONES, Circuit Judge, concurs in the result.

14. Another possibility is that American may turn out to be better off. After the suits by the Damage Plaintiffs are out of the way, American may be able successfully to maintain the proposition that the formal letter demands served by Clay on Britt and Pennsylvania have the legal effect of making the finding and judgment in the suit by the Damage Plaintiffs against Clay binding on Britt and Pennsylvania on principles of res judicata or collateral estoppel. 29 Am. Jur., Insurance § 1084 (1940). And American, after payment, as subrogation to Clay's rights, might be able to recover attorney's fees on attorney's fees if the court were to hold on the merits that Pennsylvania's refusal was unfounded. See note 10, supra.