**CONTINENTAL CASUALTY COMPANY, Plaintiff,**

v.

**SYNALLOY CORPORATION, et al., Defendants.**

**SYNALLOY CORPORATION, Third-Party Plaintiff,**

v.

**COLUMBIA CASUALTY COMPANY and Fidelity & Casualty Company of New York, Third-Party Defendants.**

No. CV182–158.

United States District Court, S.D. Georgia, Augusta Division.

Jan. 28, 1986.

David A. Handley, Thomas E. McCarter, Michael W. Higgins, Atlanta, Ga., for plaintiff.

Laronce Beard, Augusta, Ga., for Joe Roberts.

Joseph L. Blake, Jr., Thomas H. Coker, Jr., Greenville, S.C., James M. Thompson, Lee and Clark, P.C., Savannah, Ga., for Synalloy Corp.

Daniel S. Reinhardt, John P. Dalton, Atlanta, Ga., for defendants Charles Allen Skey, Rep Underwriter at Lloyd's; Walbrook Ins. Co., Ltd; St. Katherine Ins. Co., Ltd (XA/C); St. Katherine Ins. Co., Ltd; Turegum Ins. Co.; Bellefonte Ins. Co., English & American Ins. Co., Dominion Ins. Co., Ltd., & Lexington Ins. Co.

David B. Higdon, Joseph H. Davis, Macon, Ga., for Fidelity & Cas. Ins. of N.Y.

Taylor Putney, Jr., John D. Jones, Atlanta, Ga., for American Mut. Liability Ins. Co.

Luhr G.C. Beckmann, Jr., Andrew J. Hill, III, Beckmann & Pinson, P.C., Savannah, Ga., for General Accident Ins. Co.

R. Coleman Miller, James B. Hiers, Jr., Atlanta, Ga., for defendants General Accident Fire and Life Assur. Corp., Ltd.

Ronald D. Reemsnyder, Atlanta, Ga., for First State Ins.

James McGuire, Mendes & Mount, New York City, Wm. Byrd Warlick, Augusta, Ga., for third-party defendant Columbia Cas. Co.

Percy J. Blount, Burnside & Wall, Augusta, Ga., for Brown, Hall, Oliphant, Powell, Sturgis, Utley and White.

J. Robert Persons, Lord, Bissell & Brook, Atlanta, Ga., for Appalachain Ins. Co., and Affiliated FM Ins. Co.

John W. Winborne III, Atlanta, Ga., for Midland Ins. Co. and First State Ins. Co.

Richard R. Mehrhof, Jr., Augusta, Ga., for Stonewall's Ins. Co.

### ORDER

EDENFIELD, District Judge.

### I. *Introduction*

This case is again before the Court following a second non-jury trial[1] held on July 1, 1985. Since that date, the Court has considered evidence relating to these matters: the 1982 Letter Agreement, left in issue after the Court's June 26, 1985 Order; 667 F.Supp. 1550, the duty owed by any of Synalloy's insurers remaining in the case to defend against the BNA claims; whether any settlement of any BNA claim is covered under the terms, conditions, and exclusions of the excess insurance policies; and whether plaintiff Continental Casualty Company acted in bad faith or was unjustly enriched so as to justify an award of damages to Synalloy under Georgia law. This Order, which hereby incorporates and adds to the Court's previous orders entered in this case, embodies the Court's findings of fact and conclusions of law on these matters, and constitutes the final judgment in this declaratory judgment action.

### II. *Preliminaries*

At the July 1, 1985 trial, the Court dismissed American Mutual Liability Insurance Company ("American Mutual") on the ground that American Mutual was not obligated, under the terms, conditions, and exclusions of its policies allegedly issued to Synalloy, to provide Synalloy with coverage on the tort claims which are the subject of this declaratory judgment action.[2]

In this ruling, the Court will continue its journey through the wilderness of insurance policies at issue in this case to determine which, if any, of the party insurers was obligated to provide Synalloy with coverage on the underlying tort claims, which have been rendered moot as a result of the Georgia Supreme Court's decision in *Synalloy Corp. v. Newton*, 254 Ga. 174, 326 S.E.2d 470 (1985), *rev'g*, 171 Ga.App. 194, 319 S.E.2d 32 (1984), *vacated*, 174 Ga.App. 556, 332 S.E.2d 47 (1985). However, before the Court again sets out on what it perceives as an unmarked trail littered with paper, it pauses to remind the parties that this is an action for declaratory relief. It

---

1. "Trial" is indeed a curious word to describe what the Court observed on July 1, 1985. Oral testimony was minimal, as compared to the abundance of information tendered by way of depositions and designated documents.

2. See Order dated June 26, 1985 for background leading to this dismissal.

has been recognized that the Declaratory Judgment Act, 28 U.S.C. § 2201, which is the legal basis for this action, "is an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952). In that regard, while the courts should not be reluctant to grant relief under this Act, they must be alert to avoid imposition upon their jurisdiction by a party seeking to obtain futile and premature rulings of law, and they should exercise a maximum of caution where a ruling is sought that would reach far beyond a particular case. *Id.* at 243–44, 73 S.Ct. at 240.[3]

Respecting these principles, the Court has limited its consideration in this action to those issues pertaining to which insurers, if any, had a duty to defend Synalloy and now are liable for payment of the costs of defending and settling the underlying tort claims. The final decision by this Court will relate only to those expenses incurred, being paid losses, rather than to the lump sums promised individual claimants in the event they sustain observable cancer, which event is a contingency that, for purposes of this declaratory judgment action, will not be presumed by the Court.

■ Specifically, the Court acknowledges that the settlement agreements between Synalloy and numerous BNA claimants each includes a provision that 100,000 to 150,000 dollars will be paid by Synalloy to those claimants whose exposure to BNA results in cancer. However, the Court finds that such a provision for payment in the future is based on a contingency that may occur in forty years, or may never occur, and in that respect, it presents an issue of insurance coverage that should not and will not be decided in this action. Rather, the duty owed by any insurer to Synalloy at the time a claimant's right to a lump sum payment vests will be decided in accordance with the law in effect at that time, unless Synalloy in the interim makes other arrangements through private agreement.

Moreover, as the Court has stated previously, this action pertains only to the insured's[4] employees, and the issue of who among its insurers, if any, shall bear the defense and settlement costs incurred on those employees' claims for damages resulting from their alleged injury by BNA disease. Synalloy's counterclaims for unjust enrichment and bad faith damages against plaintiff Continental Casualty Company ("Continental") necessarily are a part of this controversy, and accordingly, they will be entertained in this action. But no issue based on the occurrence of a contingency will be decided; by that caveat, the Court makes specific reference to the issue of who shall bear the cost of payment that will be made by Synalloy to certain claimants if and when they sustain observable cancer resulting from exposure to BNA.

## III. *Searching for Coverage*

### A. *Primary Insurance*

■ General Accident Fire and Life Assurance Corporation, Ltd. ("General Accident") became the insured's primary insurer in 1967. The Court held in its June 26, 1985 Order that General Accident's policies in existence from 1967 to date do not afford coverage on the BNA claims; however, the Court reserved any decision on the issue of how the 1982 Letter Agreement (hereinafter "letter agreement") affects that determination. See June 26, 1985 Order at 25–28.

The letter agreement has been a consistent source of controversy among the parties to this litigation. Its history dates back to when Synalloy first received BNA claims from its employees in June, 1981.

---

**3.** The Court previously discussed the parameters of this declaratory judgment action in its June 26, 1985 Order at 28–30, relying on *Allstate Insurance Co. v. Employers Liability Assurance Corp.*, 445 F.2d 1278 (5th Cir.1971), similarly relied upon by the Eleventh Circuit in *Edwards v. Sharkey*, 747 F.2d 684, 686 (11th Cir.1984) (before reaching the merits of the case as determined under Georgia law).

**4.** For purposes of this action, the "insured" is Augusta Chemical Company and Synalloy Corporation, and may be referred to simply as "Synalloy." See June 26, 1985 Order at 4 n. 1.

Synalloy immediately notified General Accident of those claims, and by letter dated July 30, 1981, General Accident as the corporation's primary insurer informed Synalloy that it would undertake the defense of the BNA claims under a reservation of right, based on its position that a question of coverage existed. General Accident also advised Synalloy of its intention to file a declaratory judgment action; soon afterwards, Synalloy filed such an action against General Accident in the United States District Court for the District of South Carolina. During the pendency of that action, General Accident and Synalloy negotiated the letter agreement, which finally was executed to take effect on January 1, 1982. The South Carolina declaratory judgment action was dismissed subsequently.

The provisions of the letter agreement have been stated by this Court on several occasions.[5] Essentially, it waives Exclusion (e) with respect to Coverage B of General Accident's employers' liability policies in effect from January 1, 1982 through January 1, 1985, thereby affording Synalloy defense coverage for those BNA claims asserted by the insured's employees exposed to BNA during the insurer's January 1, 1967 through January 1, 1973 policy periods, under a retrospective plan. In effect, the plan provides a claims servicing tool, since the sums paid out by General Accident for defense of the subject claims ultimately are charged back to Synalloy in the form of premiums due the insurer. William D. Holland, in his capacity as the insured's chairman and chief executive officer, testified at the July 1, 1985 trial that coverage by General Accident has always been provided to Synalloy under a retrospective premium plan, and the letter agreement only continued that practice.

The question that has caused some concern in this litigation is, quite simply, whether the letter agreement is "insurance." Simple questions often are the most difficult to answer; here, there will only be a decision.

In that respect, the Court observes that the letter agreement was addressed to William D. Holland at Synalloy and signed by Ernest One, Vice President of General Accident. On its face, the letter agreement states unambiguously that

> we agree in accordance with the terms set forth in this letter that General Accident *will afford coverage for the BNA claims* under Coverage B, waiving Exclusion (e) as described. All other terms, conditions, exclusions, and limitations of the policies will remain in force.

(emphasis added). There is no dispute in evidence as to the capacity of Messrs. One and Holland to obligate their respective companies to the terms of this agreement, which states a subject matter, consideration ($25,000.00), and effective date. As to the intent of the parties, it is axiomatic that "words in a contract are to be given their usual and primary meaning at the time of the execution of the contract[;] the mere fact that at the time of suit the parties do not agree upon the proper construction of their unambiguous language does not make it ambiguous." 17 Am.Jur.2d § 247 at 639. "Coverage" is coverage, and the Court concludes that the letter agreement, by waiving Exclusion (e) as it relates to employee exposure to BNA during the insurer's 1967 through 1973 policy periods, was intended, by modification of the subject contracts, to provide insurance coverage to Synalloy for the BNA claims arising from such exposure. The Court finds that all arguments to the contrary are without merit.

For purposes of this declaratory judgment action, however, it is significant that the letter agreement did not become effective until January 1, 1982, while BNA claims were filed first in June, 1981. In addition, by its terms, coverage afforded by the letter agreement is limited to an exclusive group of claims, being those asserted by persons who were employees of the insured exposed to BNA in 1967, or during any subsequent year until BNA no longer was manufactured by the insured. And while the letter agreement did afford Synalloy eventual insurance protection,

---

5. See, e.g., Order dated June 26, 1985 at 5–6, 26.

such protection resulted only after General Accident agreed to waive, for consideration, a provision in its employers' liability policies, which policies otherwise excluded such coverage. Consequently, consideration of the letter agreement as it afforded coverage to Synalloy for costs incurred in defending against the BNA claims does not answer the question of which insurer, if any, had the duty to defend Synalloy when those claims were first asserted in 1981.[6]

Having concluded in the June 26, 1985 Order that neither American Mutual nor General Accident had this initial obligation under the terms, conditions, and exclusions of their respective policies, the Court leaves the now familiar front of primary insurance coverage, and travels forth into the more heavily-littered forest controlled by the excess insurers.

### B. *The Excess Insurance Policies*

In 1969, Synalloy continued to manufacture BNA in its Augusta, Georgia plant, which process finally ceased in 1972. The Court concludes that no employee was exposed to BNA after 1972.[7]

In 1969, Synalloy also began purchasing excess insurance coverage from the following companies, in addition to the primary insurance which the Court has discussed previously:

First Layer Excess

| | |
|---|---|
| Continental | 8/69 – 8/75 |
| Affiliated FM | 8/75 – 5/77 |
| Lloyd's | 5/77 – 5/80 |
| First State | 5/80 – 1/82 |
| Fidelity & Casualty | 4/82 – 1/83 |

Second Layer Excess

| | |
|---|---|
| Midland | 8/75 – 1/77 |
| Columbia Casualty | 9/75 – 3/76 |
| Stonewall | 3/76 – 3/77 |
| Lloyd's | 5/77 – 5/79 |

### 1. Blazing a Path

The Court is mindful at the outset of its examination of the policies issued by the excess insurers that this action pertains only to the insured's employees, and defense and settlement costs resulting from the BNA claims asserted against the insured by its employees. In that connection, it is clear on the face of certain policies that the insurer had no duty to defend Synalloy at the time the BNA claims were first filed in 1981; moreover, according to the terms and conditions of some of these same policies, certain insurers bear no duty to indemnify the insured for costs incurred in connection with the settlement of the BNA claims. The discussion below pertains to such insurers.

The Court first turns to the policies issued by the London Market ("Lloyd's"). The parties have stipulated into evidence Lloyd's Policy No. LOM 9080[8] in effect from May 3, 1977 to May 3, 1980. This policy states as a condition of coverage that the insurer "shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured...." Thus, according to the plain language of this insurance contract be-

---

6. The Court has heard no dispute in this case as to whether General Accident has exceeded the limits of coverage described in its employers' liability policies. Accordingly, the Court concludes for purposes of this declaratory judgment action that the coverage afforded Synalloy by the letter agreement has not been exhausted.

The Court also notes that General Accident was excluded from participating in the settlement of the BNA claims, under the retrospective premium arrangement, because Synalloy recognized that it ultimately would have to reimburse General Accident for all sums paid under that insurance plan. *See* General Accident Trial Exhibit 46.

7. William D. Holland, in his capacity as the insured's chairman and chief executive officer, testified in his deposition at 77 that the last harmful exposure to BNA occurred on the insured's premises in April, 1972. Julian H. Jumper, who retired in 1973 from his employment with the insured, also testified at the July 1, 1985 trial, in his capacity as the insured's former plant manager, that remnants of BNA were finally cleaned out of the insured's premises in the latter part of 1972. Mr. Jumper's testimony was unrebutted; thus, the Court amends its June 26, 1985 Order at 12, where the Court relied upon a pretrial stipulation stating that the clean-up process was completed in 1973.

8. See Schedule of Insurance Policies Exhibit Q. See also Transcript of Non-Jury Trial held December 3 and 4, 1984, Vol. I at 6, for discussion regarding the proper name of this party.

tween Lloyd's and Synalloy, Lloyd's had no duty to defend its insured against the BNA claims underlying this action, and Lloyd's has consistently chosen not to invoke any right to so defend, on the basis that workers' compensation provided the exclusive remedy to the BNA claimants.

■ Moreover, the Court observes that coverage under the second layer excess insurance policies issued by Lloyd's [9] conforms to that coverage provided by the underlying excess insurance policy. Specifically, the second layer policies both state in pertinent part that the insurer

hereby agree[s], subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of liability:— for damages on account of:—
(i) Personal Injuries
caused by or arising out of each occurrence happening anywhere in the world, *and arising out of hazards covered by and as defined in the Underlying Umbrella policies* stated in Item 2 of the Declarations....

DECLARATIONS:

ITEM 2. (a) Underlying Umbrella Policies: —
LOM 9080
(b) Underlying Umbrella Insureres: —
Under writers at Lloyd's

(emphasis added).

Thus, coverage under the terms of Lloyd's second layer excess insurance policies is limited to those hazards covered by the first layer excess policy, No. LOM 9080, which policy unambiguously excludes any duty to defend or settle any claim asserted against the insured.

■ The Court next examines the excess insurance policy issued by Midland Insurance Company ("Midland") for the period August 31, 1975 to January 1, 1978, and cancelled on January 1, 1977.[10] The Midland policy is a "form-following" contract

by which the insurer promises to indemnify Synalloy

against ultimate net loss in excess of and arising out of the hazards covered and as defined and in excess of the underlying insurance as shown in Item 3 of the Declarations (hereinafter referred to as "underlying insurance")....

DECLARATIONS

ITEM 3. Underlying Insurance: General Accident
Fire & Life Assurance Co.
General Liability — Bodily Injury

Accordingly, the Midland policy affords Synalloy coverage in the event that General Accident's general liabilty policies are triggered and exhausted during Midland's policy period.

The Court has found previously,[11] however, that General Accident's general liability policies did not at the time of their institution and do not now cover the claims asserted against Synalloy in the underlying tort actions. Any eventual insurance protection afforded by General Accident to Synalloy by way of the letter agreement is based on the insurer's waiver of Exclusion (e) in its employers' liability policies, for specified policy periods. Because Midland did not contract with Synalloy to provide employers' liability coverage, the letter agreement does not affect in any way the Court's present conclusion that the Midland policy provides no coverage on the BNA claims underlying this action. Midland therefore is dismissed from this case.

■ Columbia Casualty Company ("Columbia") issued an excess liability policy [12] to Synalloy for the period September 16, 1975 to March 5, 1976. Columbia agreed "[t]o indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the *underlying insurance* inserted in column II of item 4 in the declarations...." (emphasis in original). Further, "[t]he provisions of the *immediate underlying policy* are incorporated as a part of this policy *except for any obli-*

---

9. See Exhibits W and X, stipulated into evidence as representing those policies in effect from May 3, 1977 to May 3, 1978 and May 3, 1978 to May 3, 1979, respectively.

10. See Schedule of Insurance Policies Exhibit T.

11. See June 26, 1985 Order at 20–23.

12. See Schedule of Insurance Policies Exhibit U.

*gation to investigate or defend* and pay for costs and expenses incident to the same...." (emphasis added). Finally,

> [t]his policy applies to injury or destruction taking place during this policy period, provided that when the *immediate underlying policy* insures occurrences taking place during its policy period, instead of injury or destruction taking place during its policy period, then this policy likewise applies to occurrences taking place during this policy period....

The insurance policies underlying the Midland policy were General Accident comprehensive liability and employers' liability policies.

■ By the plain language of the insuring agreement, any duty to defend the insured against claims covered by the underlying policies is excluded. In addition, the only coverage afforded by the underlying policies in Midland's situation results from the letter agreement waiving Exclusion (e) as to General Accident's employers' liability policies effective in 1982 through 1985 and pertaining only to BNA exposures occurring in policy periods 1967 through 1972. Columbia did not provide excess coverage to Synalloy during any of these policy periods made critical by the letter agreement, so Columbia's policy has not been triggered by any underlying coverage. Accordingly, Columbia is dismissed from this action.

■ Stonewall Insurance Company ("Stonewall") provided Synalloy excess liability insurance during the period March 5, 1976 through March 5, 1977.[13] Its policy states, in pertinent part:

> C. The insurance afforded by this policy shall follow that of the underlying insurance except:
>
> (1) Anything in this policy or in the underlying insurance to the contrary notwithstanding, the Company shall not be called upon to assume charge of the settlement or defense of any claim

or suit brought, or proceeding instituted against the insured....

The insurance underlying Stonewall's policy that is pertinent to this action[14] includes the Midland policy and General Accident's general liability and employers' liability policies.

On its face, the Stonewall policy excludes any duty by the insurer to defend Synalloy against the BNA claims. Moreover, as the Court determined previously, the underlying Midland policy affords no coverage to Synalloy on the BNA claims that might trigger coverage under the Stonewall policy. Finally, but for the letter agreement waiving Exclusion (e) during policy periods 1982 through 1985 with respect to BNA exposures occurring during policy periods 1967 through 1972, no coverage is owed by General Accident to Synalloy on the BNA claims underlying this action. Because the Stonewall policy falls outside of the periods made critical by the letter agreement, there is no insurer underlying Stonewall's policy who is obligated to provide coverage on the BNA claims. Accordingly, Stonewall is not obligated to provide any coverage on those claims, and is hereby dismissed from this action.

In summary, it is the judgment of this Court that Lloyd's had no duty to defend, according to the terms of its policies issued to Synalloy. Furthermore, the insurance policies issued to Synalloy by Midland, Columbia, and Stonewall do not cover the claims asserted by the BNA claimants. Consequently, Midland, Columbia, and Stonewall are dismissed from this action.

**2. Continental, Affiliated FM, First State, F & C, and Lloyd's**

**a. Duty to Defend**

The policies issued to Synalloy by Continental, Affiliated FM Insurance Company, First State Insurance Company, and Fidelity & Casualty Company of New York do not expressly exclude the insurer's duty to

---

**13.** See Schedule of Insurance Policies Exhibit V.

**14.** The Court notes that Appalachian Insurance Company is listed in the Stonewall policy as an underlying insurer; however, the parties have agreed previously that Appalachian had no duty to provide Synalloy with coverage on the BNA claims. See December 23, 1982 Order dismissing Appalachian from this case.

defend its insured against any claim. Accordingly, the Court must examine the terms, conditions, and exclusions contained in these insurers' policies to determine whether their coverage provisions were triggered when the BNA claims were instituted in June, 1981.

Each of these policies contains terms by which the insurer agrees to provide coverage for damages arising out of an "occurrence" resulting in "personal injury" during the policy period. "Personal injury" is defined in each of the policies as including both bodily and mental injury.[15] "Occurrence" is defined in each of the policies as, essentially, an accident, happening, event, or a continuous or repeated exposure to conditions, which exposure results in, during the policy period, personal injury neither expected nor intended from the standpoint of the insured.

In deciding how these terms relate to each other in the context of the present case, the Court first recalls its previous rulings that the underlying tort actions state claims relating to bodily as well as mental injury, and the alleged bodily injury has been qualified specifically as a "disease."[16] The Court will discuss later what it qualifies as the "mental injury" alleged by the BNA claimants. For now, the Court will focus on what happening, event, accident, or exposure could have resulted in BNA disease, as alleged in the underlying complaints.

Significantly, the parties to this action have not asserted that the excess insurance contracts contain ambiguous language. Yet they ask the Court to "interpret" the terms of these contracts as construed by courts in cases such as *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.1981) (*followed* in *Commercial Union Insurance Co. v. Sepco Corp.*, 765 F.2d 1543 (11th Cir.1985)) and *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980),

among others, in which those courts constructed a "trigger of coverage" on the basis of what they perceived to be the intention of the contracting parties. However, the Court observes that the parties to those cases strenuously argued that the contracts in issue were ambiguous. *See, e.g., Insurance Co. of North America*, 633 F.2d at 1222.

There being no such argument in this case,[17] however, the Court defers to well-settled law in Georgia, holding that "when the language of an insurance contract fixing the extent of the insurer's liability is unambiguous, a court must expound the contract as made." *Edwards v. Sharkey*, 747 F.2d 684, 687 (11th Cir.1984) (citing *Cantrell v. Home Security Life Insurance Co.*, 165 Ga.App. 670, 302 S.E.2d 415 (1983); *Guarantee Trust Life Insurance Co. v. Davis*, 149 Ga.App. 826, 256 S.E.2d 76, *aff'd in part, rev'd in part*, 244 Ga. 541, 261 S.E.2d 336 (1979)).

> Insurance is a matter of contract, and the language used is to be accorded its general ordinary meaning, bearing in mind that the contract is to be construed in accordance with the intention and understanding of the parties, and in construing it the court cannot go further than a fair construction of the language used will permit. Where the contract is unambiguous, it must be construed to mean what it says ... [A]mbiguity is not to be created by lifting a clause or portion of the contract out of context. The natural, obvious meaning is to be preferred over any curious, hidden meaning which nothing but the exigency of a hard case and ingenuity of a trained and acute mind would discover.

*Lester v. Great Central Insurance Co.*, 138 Ga.App. 353, 354–55, 226 S.E.2d 149 (1976), quoted in *St. Paul Fire & Marine Insurance Co. v. Cohen-Walker, Inc.*, 171 Ga.App. 542, 544, 320 S.E.2d 385 (1984).

---

**15.** For example, the policy issued by First State Insurance Company defines "personal injury" as "bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish and mental injury."

**16.** See June 26, 1985 Order at 12.

**17.** Indeed, what argument has transpired on this issue has been to the contrary. *See, e.g.,* Transcript of Non-Jury Trial held on December 3 and 4, 1984, Vol. II at 281, 307–08.

In applying these principles to the instant case, the Court first holds that the language of the subject insurance policies is unambiguous. The policies essentially describe an "occurrence" as, among other things, an "exposure to conditions" which results in bodily injury. In their complaints, the BNA claimants contend, among other things, that they have been exposed to BNA, causing them to suffer pain of body and mind and causing each of them injuries and damages. Reading the policy language and the pertinent allegations of the complaints together, *Great American Insurance Co. v. McKemie*, 244 Ga. 84, 85–86, 259 S.E.2d 39 (1979), the Court concludes that the term "occurrence," for purposes of the BNA bodily injury claims, refers to the continuous exposure of the insured's employees to BNA at the time it was manufactured or otherwise on the premises of the insured, which exposure resulted in bodily injury.

As noted previously, some, if not all, of the underlying tort actions instituted in June, 1981 state a claim for mental injury, in addition to a bodily injury claim. Specifically, the pertinent complaints state that the plaintiffs did not know or appreciate the dangers of the use of BNA until January, 1981, when they first were informed of the probable effects of BNA. The complaints state further that these plaintiffs suffer constant worry and anxiety about the probable effects of BNA on their bodies. Later-filed complaints specifically demand that in the alternative to a judgment awarding the BNA plaintiffs actual and punitive damages, they be awarded damages against Synalloy for injuries to their peace, feelings and happiness, which injuries presumably result from what they first learned in January, 1981.

Again referring to the language essentially included in all of the excess insurance policies in issue, the Court observes that "personal injury" includes "mental injury," and an "occurrence" is defined as, essentially, a "happening" or an "event" that results in such injury. More significant in the context of the mental injury claims is that phrase in the definition of "occurrence" which qualifies the injury as being "neither expected nor intended" from the standpoint of the insured.

Considering these terms in relation to the facts alleged in the pertinent underlying tort actions raises this hypothetical: If a man is exposed at his work place to a substance that, without his knowledge or the knowledge of his employer, poses a significant risk to his health, and he learns later from his employer that this substance is carcinogenic, it is within the common experience of reasonable persons that at the time when the man receives this information, he will experience some distress. The law may not reach out to compensate this distress, or "mental injury;" however, it is by its nature foreseeable, or to be expected, by the one voluntarily imparting the knowledge, regardless of his intent to do harm. *Compare Landress v. Phoenix Insurance Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934) (drawing a distinction between an accidental result and a result brought about by accidental means); *C. Raymond Davis & Sons, Inc. v. Liberty Mutual Insurance Co.*, 467 F.Supp. 17 (1979) (construing definition of "expected" as "considered more likely than not to occur").

This scenario presents the Court's view of what is being alleged in the underlying complaints with respect to "mental injury." Essentially, a BNA claimant may recognize that he is unable to prove bodily injury at the time his action is filed; yet he anticipates in the alternative that his peers have experienced the pain of knowledge, and he seeks to recover on it. The Court, in turn, must decide whether such a claim triggers coverage for defense purposes, according to the terms, conditions, and exclusions contained in the insured's excess insurance policies.

In light of the foregoing discussion, the Court now will examine those policies individually.

### (i) Fidelity & Casualty Company of New York

Fidelity & Casualty Company of New York ("F & C") issued Synalloy an excess

insurance policy effective during the period April 8, 1982 to January 1, 1983.[18] That policy provided for coverage under the following terms:

### CONDITIONS

5. *Underlying insurance.* The insured shall maintain in full effect during the policy period all the underlying insurance described in the declarations, except for any reduction or exhaustion during the term of this policy of any aggregate limit of liability stated in any such underlying insurance solely by payment of claims in connection with accidents or occurrences which occur during the term of this policy. If the insured fails to maintain any such underlying insurance in force, the insurance afforded by this policy shall apply only in the same manner as it would have applied had such insurance been so maintained in force. If underlying insurance is exhausted by any accident or occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same accident or occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

I. *Coverage*

To pay on behalf of the insured the ultimate net loss, in excess of the applicable underlying or retained limit, which the insured shall become legally obligated to pay as damages because of

(A) Personal Injury

to which this policy applies, caused by an occurrence.

II. *Defense, Settlement, Supplementary Payments*

When underlying insurance exists, the company shall have the right but not the obligation to participate at any time in the defense of any suit against the insured.

When an occurrence is not covered by the underlying insurance listed in the underlying insurance schedule ..., but covered by the terms of this policy, ... the company ... shall: (a) defend any suit against the insured even if any of the allegations thereof are groundless, false or fraudulent....

III. *Definitions*

(h) *"Occurrence"* means an accident, including continuous or repeated exposure to conditions, which results in personal injury ... neither expected nor intended from the standpoint of the insured.

(i) *"Personal injury"* means bodily injury, sickness, disability, disease or death, shock, mental anguish and mental injury....

(1) *"Ultimate net loss"* means the sum actually paid or payable in cash in settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company ..., but excludes all loss expenses and legal expenses ... the company or any underlying insurer so incurred.

IV. *Application of Policy*

This policy applies only to personal injury ... happening during the policy period.

The insurance listed as underlying F & C's policy is General Accident comprehensive general liability and workmen's compensation and employers' liability.

■ The Court observes that the plain language of the F & C policy excludes the insurer's obligation to defend those BNA actions covered by General Accident under the letter agreement. Moreover, the "ultimate net loss" payable by this insurer upon exhaustion of underlying insurance expressly excludes "all loss expenses and legal expenses ... the company or any underlying insurer so incurred." Because there is no contention that the underlying insurer, General Accident, exhausted its policy limits, *see supra* at 1569 n. 6, and the F & C policy excludes coverage under the "ultimate net loss" provision for any legal expenses incurred by its underlying insurer, coverage under F & C's policy is

---

**18.** See Schedule of Insurance Policies Exhibit S.

not triggered for purposes of defending against the BNA claims covered under the letter agreement.

■ The question remaining is whether F & C owes coverage to Synalloy under its separate provision affording a defense to the insured "[w]hen an occurrence is not covered by the underlying insurance ... but covered by the terms of this policy[.]" In deciding this issue, the Court is mindful that "[t]he obligation to defend is distinct and separate" from the duty to indemnify under an insuring agreement. *American F. & C. Co. v. Pennsylvania T. & F.M. Casualty Insurance Co.*, 280 F.2d 453, 458 (5th Cir.1960). The duty to defend is determined by the contract, and the allegations of the complaint are considered to determine whether a liability covered by the policy is asserted. *Great American Insurance Co. v. McKemie, supra,* 244 Ga. at 85–86, 259 S.E.2d 39.

With respect to the mental injury claims asserted by the BNA claimants, the Court is of the opinion that F & C effectively excluded coverage for such claims by including the phrase "neither expected nor intended from the standpoint of the insured" in its definition of "occurrence." Specifically, the Court concludes after examination of the plain language of the coverage provisions and consideration of its previous discussion, *supra,* at 1573, that F & C did not intend to provide coverage against claims that its insured allegedly caused employees mental distress.

■ Having concluded that the F & C policy does not cover the mental injury claims, the Court must decide whether F & C owes any defense obligation with respect to the bodily injury claims. As the Court determined previously, *supra,* at 1573, the term "occurrence," for purposes of the bodily injury claims, refers to the continuous exposure of the insured's employees to BNA at the time it was manufactured or otherwise on the premises of the insured. Specifically, the term "occurrence" includes a cause ("accident, including continuous or

repeated exposure to conditions") and an effect ("personal injury") "happening during the policy period." Because no exposure to BNA "happened" after 1972, the allegations contained in the underlying complaints fail to satisfy all components of the plain-language requirement triggering coverage under the F & C policy effective ten years later. Accordingly, the F & C policy afforded no coverage to its insured in connection with the BNA claims asserted during its policy period. F & C is hereby dismissed from this action.

(ii) First State Insurance Company

First State Insurance Company ("First State") issued Synalloy an excess insurance policy in effect from May 3, 1980 to January 1, 1982.[19] Similar to the policy issued by F & C, the First State policy provides for coverage to Synalloy in accordance with the following pertinent terms:

I. *Coverage*

To indemnify the insured for ULTIMATE LOSS, as defined hereinafter, ... all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses because of:

A. PERSONAL INJURY, as hereinafter defined:

to which this policy applies, caused by an OCCURRENCE....

II. UNDERLYING LIMIT—RETAINED LIMIT

The Company shall be liable only for the ULTIMATE NET LOSS in excess of the greater of the INSURED'S

A. UNDERLYING LIMIT—an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A of underlying insurance, plus the applicable limits of any other underlying insurance collectible by the INSURED, or

B. RETAINED LIMIT—The amount ... as a result of any one occurrence not covered by said underlying insur-

---

**19.** See Schedule of Insurance Policies Exhibit R.

ance, and which shall be borne by the insured.

IV. DEFENSE—SETTLEMENT

A. With respect to any OCCUR-RENCE not covered ... by the underlying policies ... but covered by the terms and conditions of this policy, ... the Company shall:

1. defend any suit against the insured alleging PERSONAL INJURY ... and seeking damages therefore, even if such suit is groundless, false or fraudulent....

B. When underlying insurance, whether or not listed in Schedule A, does apply to an OCCURRENCE, the Company shall have no duty to pay defense, investigations, settlement or legal expenses covered by such underlying insurance....

### DEFINITIONS

H. OCCURRENCE:

... "OCCURRENCE" shall mean an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY ... neither expected nor intended from the standpoint of the INSURED.

I. PERSONAL INJURY:

The term PERSONAL INJURY wherever used herein means;

(1) bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish and mental injury,

which occurs during the policy period.

L. ULTIMATE NET LOSS:

Means the sums paid as damages in settlement of a claim ... after making deductions for all other recoveries, salvages, and other insurances ... other than the underlying insurance....

The insurance listed as underlying the First State policy is General Accident comprehensive general liability and employers' liability. The Court has determined previously that when the BNA suits were instituted in 1981, General Accident owed no coverage to Synalloy, according to the terms, conditions, and exclusions contained in its primary insurance policies, as they pertained to the BNA claims. This conclusion is not changed by the letter agreement in First State's situation, because First State's period of coverage ended prior to the effective date of that agreement. Accordingly, the Court must decide whether First State owed Synalloy a duty to defend "[w]ith respect to any OCCURRENCE not covered ... by the underlying policies...."

With respect to the mental injury claims, the Court concludes from examination of the contract and reliance on previous discussion that First State effectively excluded such claims from coverage by the phrase "neither expected nor intended from the standpoint of the insured" contained within its definition of "occurrence." While the knowledge giving rise to these claims first was imparted by the insured to its employees during the First State policy period, and this "event" resulted in the alleged personal injury during that policy period, "mental anguish" is undisputably an expected result under the circumstances, and "expected results" are not covered under First State's policy.

Nor does the First State policy provide coverage for the bodily injury claims asserted in the underlying tort cases. As the Court has discussed generally, *supra*, at 1573, and specifically in regard to the F & C policy, the term "occurrence" relates to a cause ("accident or event, including continuous repeated exposure to conditions") and an effect ("which results ... in PERSONAL INJURY") occurring during the policy period. Again, according to the plain language of the First State policy, there can be no coverage during a policy period when there was no exposure to the condition allegedly resulting in disease. *See Great American Insurance Co. v. McKemie, supra*, 244 Ga. at 85–86, 259 S.E.2d 39. Accordingly, First State had no duty to defend its insured when the BNA claims were instituted during its policy period. Having determined that First State afforded its insured no coverage on the BNA claims according to the terms and conditions of its contract, First State is hereby dismissed from this action.

(iii) Affiliated FM Insurance Company

 Affiliated FM Insurance Company ("Affiliated FM") issued Synalloy a first layer excess insurance policy for the period August 31, 1975 to January 1, 1978. Its insurance contract contains essentially the same language as that found in the F & C and First State policies, quoted previously in pertinent part. Similar to the F & C policy, *see supra*, at 1573–1575, the Affiliated FM policy provides coverage under such terms and conditions, in excess of that coverage afforded by the underlying insurer, General Accident, under its workmen's compensation and employers' liability and comprehensive employer's liability policies. However, unlike the F & C policy, the policy issued by Affiliated FM falls outside of the policy period made critical by the letter agreement, and therefore is not affected by the underlying coverage provided in accordance with that agreement. Moreover, similar to the F & C and First State policies, the Affiliated FM policy applies only to occurrences during the policy period. On the basis of these observations and consideration of previous discussions relating to similar if not identical contract language, the Court concludes that the policy issued by Affiliated FM does not provide coverage on the underlying tort claims.

Specifically, with respect to the mental injury claims, there was no "accident" or other event during this insurer's policy period that could trigger coverage on an "occurrence," as that term is defined. First, it was not until 1981 that Synalloy informed its employees about their increased risk of cancer, thereby imparting the knowledge that allegedly resulted in their mental anguish. Second, while the underlying complaints include as one cause of action the insured's "failure to warn" its employees about the alleged known defect in its product, which "failure to warn" allegedly occurred during the policy period, that allegation describes an intentional act on the part of the insured, thereby excluding it from coverage in accordance with the definition of "occurrence" as an "accident ... neither expected nor intended from the standpoint of the insured." Accordingly, the claims for mental injury are excluded from coverage under the terms of the Affiliated FM policy.

With respect to the bodily injury claims, the Court adheres to its previous determination that in order for "a continuous or repeated exposure to conditions" to result in personal injury for purposes of insurance coverage, both the cause and effect must occur within the policy period. Affiliated FM issued its policy to Synalloy only after BNA was removed from the insured's premises. Thus, the elements of an "occurrence" triggering coverage for bodily injury are not satisfied under the terms and conditions of Affiliated FM's policy.

Consequently, there being no potential coverage on either the mental or bodily injury claims asserted in the underlying tort actions, Affiliated FM is hereby dismissed from this action.

(iv) Continental Casualty Company

Continental issued to Synalloy two successive excess insurance policies for the periods August 31, 1969 through August 31, 1972 and August 31, 1972 through August 31, 1975. General Accident is listed as the underlying insurer in both policies; the first policy is "excess" to General Accident general liability and employers' liability coverage, while the second policy relates only to General Accident comprehensive liability coverage.[20] The language contained in both of the Continental policies is essentially identical. *See* Deposition of Edward L. Williams at 24.

In each of its policies, Continental agrees to provide coverage to Synalloy under the following pertinent terms:

1. COVERAGE A—EXCESS LIABILITY INDEMNITY
The company will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance ... [and t]he provisions of the immediate underlying policy are, with respect to Coverage A, incorporated as a part of this policy except for any obligation to

---

**20.** See Schedule of Insurance Policies Exhibits N and O.

investigate and defend and pay for costs and expenses incident to any of the same....

2. COVERAGE B—EXCESS LIABILITY INDEMNITY OVER RETAINED LIMIT

The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance, or with respect to damages not covered by underlying insurance but which results from an occurrence covered by underlying insurance, for ultimate net loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of

personal injury,

to which this coverage applies, caused by an occurrence. The company, with respect to an occurrence not covered in whole or in part by underlying insurance or to which there is no other insurance in any way applicable, shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury....

5. POLICY PERIOD

Coverage A—This coverage applies to injury or destruction which occurs during this policy period....

Coverage B—This coverage applies to personal injury ... taking place during this policy period.

## DEFINITIONS

"loss" means with respect to Coverage A the sums paid as damages in settlement of a claim ..., after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance....

"occurrence" means

(1) with respect to subsection (1) of the definition of personal injury and with respect to ... an accident, including injurious exposure to conditions, which results during this policy period, in such personal injury ... neither expected nor intended from the standpoint of the insured.

"personal injury" means

(1) bodily injury, shock, mental injury or mental anguish;

"retained limit" means the amount stated in item 4 of the declarations or any other collectible insurance (other than underlying insurance or insurance specifically in excess of this policy) which is available to the insured.

"ultimate net loss" means the sums paid as damages in settlement of a claim ... after making deductions for all other recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance ... and also includes investigation, adjustment, appraisal, appeal and defense costs paid or incurred by the insured with respect to damages covered hereunder. "Ultimate net loss" does not include (a) costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the insured[.]

Continental first learned of the BNA claims in August, 1981. *See* Deposition of Edward L. Williams at 9. As background, the Court recalls that in July, 1981, General Accident denied Synalloy primary insurance coverage on the BNA claims, and Synalloy then instituted a declaratory judgment action against General Accident in a South Carolina federal court. The Court already has determined that during this period, General Accident owed no coverage obligation to Synalloy, according to the terms, conditions, and exclusions of its comprehensive general liability and employers' liability policies. Accordingly, the Court concludes that if Continental owed coverage to its insured when the BNA claims were instituted in 1981, such obligation arose under Coverage B, providing for indemnity to the insured with respect to any occurrence not covered by underlying insurance, or damages resulting from a covered occurrence which are not themselves covered.

■ According to the plain language of the Continental policies, Coverage B applies only to personal injury taking place

during the policy period. "Personal injury" includes mental injury; however, the mental injuries alleged in the underlying tort actions did not "take place" during either of Continental's policy periods. *See* discussion, *supra*, at 1577, with respect to the Affiliated FM policy. Thus, no duty arose on the part of Continental with respect to the mental injury claims.

 The bodily injury for which the BNA claimants seek damages allegedly resulted from exposure to BNA on the insured's premises. Reading the allegations of the complaints in conjunction with the policy language, *Great American Insurance Co. v. McKemie, supra*, 244 Ga. at 85–86, 259 S.E.2d 39, Continental's duty to defend would be triggered if the allegations asserted satisfy the term "occurrence," meaning a cause ("accident, including continuous or repeated exposure to conditions") and an effect ("personal injury") "taking place during this policy period." In that connection and considering all foregoing discussion, it appears that Continental would have been obligated under Coverage B to defend Synalloy against those BNA claims instituted in 1981 and asserted by employees exposed to BNA during its August, 1969 through August, 1972 policy period. Arguments to the contrary are without merit.[21]

To summarize for the benefit of all parties to this action, the Court thus far has determined that Continental had the initial and sole duty to defend Synalloy against the underlying tort claims, with respect to those claims asserted by employees who were exposed to BNA during Continental's 1969 through 1972 policy period, in accordance with its agreement under Coverage B

of that policy, "to defend any suit against the insured seeking damages" on account of personal injury covered by the policy.[22]

**(b) Duty to Indemnify**

**(i) Lloyd's**

While the Lloyd's first layer excess insurance policy,[23] in effect from 1977 through 1980, expressly excludes any duty to defend its insured, *see supra*, at 1569–1570 its coverage provisions do include a duty to indemnify, according to the following pertinent terms:

I. COVERAGE—
Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

(b) assumed under contract or agreement by the Named Insured

for damages on account of:—

(i) Personal Injuries

caused by or arising out of each occurrence. . . .

II. LIMIT OF LIABILITY—
Underwriters hereinafter shall be liable for the ultimate net loss the excess of [underlying limits]

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses paid thereunder, this Policy subject to all the terms, conditions and definitions hereof shall

(1) in the event of reduction pay the excess of the reduced underlying limit

(2) in the event of exhaustion continue in force as underlying insurance.

---

**21.** Continental argues, for example, that even if the terms of its policies afford coverage on the BNA bodily injury claims, such claims are then excluded from coverage on the basis of the "pollution exclusion," referring to the following language: "this insurance does not apply to bodily injury . . . arising out of the discharge, dispersal, release or escape of smoke, vapors . . . toxic chemicals . . . into or upon the land . . . [unless] sudden and accidental." This exclusion does not apply to direct exposures of employees to toxic chemicals in an enclosed working environment, as alleged in the underlying complaints. *See, generally,* Annot., 39 A.L.R. 4th 1047 (1985).

**22.** Such claims would include the class action filed against Synalloy in Richmond County, Georgia, on June 9, 1981. *See* Continental Trial Exhibit 153 (Index to Complaints).

**23.** Conclusions made with respect to coverage under the Lloyd's first layer excess liability policy automatically reflect upon any coverage affordable under the second layer policies. See discussion, *supra,* at 1569–1570.

The insurance underlying the Lloyd's policy is listed as General Accident comprehensive general liability and employers' liability. As determined above, *supra,* at 1569 n. 6, there is no contention nor proof in evidence that General Accident has exhausted coverage under the provisions of the letter agreement, and otherwise, the General Accident policies afford no coverage on the BNA claims. Accordingly, liability for indemnity in excess of the underlying insurance has not been triggered with respect to the Lloyd's policy, and in any event, the policy falls outside of the periods made critical by the letter agreement.

The Lloyd's policy expresses no separate provision for indemnifying its insured in the event that underlying insurance is denied or otherwise unavailable. Instead, the policy states at Condition J that "[l]iability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence." In that respect, the Lloyd's policy differs from those excess liability policies issued by First State, F & C, and Affiliated FM. However, as all other terms included in these policies are essentially identical, including coverage on "occurrences" during their respective policy periods, the Court concludes on the basis of determinations made with respect to those policies in general and the Affiliated FM policy, *supra,* at 1576–1577, in particular, that no coverage on the BNA claims can attach under the Lloyd's insuring agreement. Lloyd's is hereby dismissed from this action.

(ii) Continental Casualty Company

According to the terms of its policy in effect from August 31, 1969 to August 31, 1972, Continental agrees under Coverage B to indemnify its insured with respect to any occurrence not covered by underlying insurance for "ultimate net loss" in excess of the insured's retained limit which the insured paid in settlement of any claim covered by the policy. This obligation to indemnify the insured for amounts paid in settlement arises in conjunction with Continental's duty to defend, as determined, *supra,* at 1578. Specifically, Condition 6(c) of the policy states in pertinent part that "[t]he insured shall cooperate with the company and, upon the company's request, assist in making settlements...." In connection with the BNA claims, this provision potentially pertains to all sums paid on the settlements of those claims asserted by the insured's employees who were exposed to BNA during Continental's policy period, and consitutes one component of "ultimate net loss" suffered by the insured, if not paid by "other insurance." The Court also notes at this point that Condition 6(a) requires mitigation, as follows:

> With respect to Coverage B, the named insured shall take at his own expense all reasonable steps to prevent additional injuries or damages arising out of the same or similar conditions at the same location, but such expense shall not be recoverable under this policy.

It is the conclusion of the Court, reading the policy as a whole, that this condition to coverage relates to mitigation of events causing injury to those asserting claims against the insured, and not to an obligation by the insured to settle those claims so as to mitigate its own losses.

A second component of "ultimate net loss" that the Court must consider relates to "appeal and defense costs paid or incurred by the insured with respect to damages covered hereunder." "Costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the insured" are excluded from coverage. *See* policy definitions, *supra,* at 1577–1578.

Accordingly, as to both the settlement and defense costs paid by the insured, if either or both are "recovered or recoverable" under other insurance, then Continental bears no indemnity obligation to its insured, according to the terms of their insuring agreement. The Court has established in the foregoing discussion and conclusions that General Accident, under its letter agreement with the insured, is the only source of such other insurance with

respect to the BNA claims underlying this action.

As considered previously, the letter agreement provides for coverage on those claims arising out of exposures of the insured's employees to BNA during the period 1967 through 1973. This period is broader than and overlaps with Continental's period of coverage on exposures occurring between August 31, 1969 through August 31, 1972. As a further consideration, the Court notes that the letter agreement was not effective until after Continental's duty to defend already had been triggered by BNA claims filed in June, 1981. Indeed, the Court suspects that coverage would not have been afforded under the letter agreement on those claims arising from exposures during Continental's policy period, had Continental understood its defense obligation and acted on it in 1981.

█ Synalloy appears to have taken such a position in its second counterclaim asserted against Continental, in which Synalloy pleads that Continental has been unjustly enriched in the amount expended by Synalloy on claims covered under Continental's policy. The Court recognizes that the insured did indirectly incur defense and settlement expenses, in spite of the letter agreement's coverage provisions, as a consequence of the retrospective premium plan by which General Accident charged back to Synalloy any sums expended in defense or settlement of the BNA claims. Thus, in order to determine Continental's indemnity obligation in view of the letter agreement, the Court first must decide whether Continental acted in bad faith or was unjustly enriched when it denied any duty to defend Synalloy against the underlying tort claims.

### C. The Counterclaims

█ In its response to this declaratory judgment action filed by Continental on July 23, 1982, Synalloy states, among other things, two counterclaims against this excess insurer. First, Synalloy asserts that Continental's failure and refusal for a period in excess of one year to respond to its insured's demands for coverage and a defense constitutes bad faith, resulting in damage to Synalloy.[24] Second, Synalloy contends that by its failure and refusal to defend its insured, Continental has been unjustly enriched at the expense of Synalloy, which insured "has taken steps and expended money in the defense of the claims of the BNA claimants during the unreasonable period of delay by Continental in responding to the demands for coverage by Synalloy," thereby entitling Synalloy to a money judgment in the amount by which Continental has been unjustly enriched.

Some history must be considered in order to objectively evaluate these claims. Specifically, from the time the underlying complaints were instituted and during the pendency of this declaratory judgment action, Synalloy has asserted defensively in both federal and state court that workers' compensation provides the exclusive remedy to its employees suffering injuries from exposure to BNA. That defense finally was accepted and held as the law by the Georgia Supreme Court in Synalloy Corp. v. Newton, 254 Ga. 174, 326 S.E.2d 470 (1985).

Significantly, Continental never contracted to provide Synalloy any workers' compensation coverage. General Accident did; however, General Accident, as Synalloy's primary insurer since 1967, denied coverage on the BNA claims, but agreed to defend its insured under a reservation of right to have its liability declared. Synalloy responded by filing a declaratory judgment action against General Accident. Meanwhile, Continental, as the insured's

24. The Court notes that Synalloy could not bring a declaratory judgment action against Continental, as it did against General Accident, because such action was precluded under Condition 7 of Continental's policy, providing that "[n]o action shall lie against the company ... until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured or by written agreement of the insured, the claimant and the company[,]" which events had not occurred prior to the insurer's own filing of this declaratory judgment action in July, 1982.

excess insurer during the period 1969 through 1975, also denied coverage on the BNA claims, and refused to provide any defense, asserting that General Accident had the immediate duty to perform these obligations, up to the limits of its coverage.

While these disputes over insurance coverage were raging, Synalloy continued to advocate its workers' compensation exclusive remedy defense, initially asserted in a federal diversity forum. During the pendency of that action, Synalloy entered into the letter agreement with General Accident, which agreement provides coverage for defense against certain BNA claims. Continental watched while this agreement was made effective on January 1, 1982.

Then on April 26, 1982, the federal court rendered its decision on the workers' compensation issue. Essentially, the court held that some of the tort claims were subject to the exclusive remedy, while others were not. *See Hall v. Synalloy Corp.,* 540 F.Supp. 263 (1982). Continental responded to the *Hall* decision by filing this declaratory judgment action in July, 1982. The Court notes that at the point this action was instituted, no judgment had been rendered on any underlying tort claim, nor had the workers' compensation issue finally been resolved.

From the outset of these proceedings, Continental has denied any duty to defend any of the BNA claims, on the ground that it incurs no defense obligation while other insurance exists to cover those claims.[25] It is apparent from its position that Continental expected General Accident and Synalloy to pursue the workers' compensation defense and so relieve this insurer from potential liability under its excess policies. Indeed, the final result, declared by the Georgia Supreme Court in *Newton, supra,* favors Continental's position. The question remaining for this Court to decide is whether it was wrongful for Continental to deny Synalloy a defense in the interim. *See Rutledge v. Dixie Automobile Insurance Co.,* 106 Ga.App. 577, 579, 106 Ga. App. 577 (award of bad faith damages depends on proof that insurer's denial of coverage was "wrongful").

As discussed by the Fifth Circuit in *American Fidelity Casualty Co. v. Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Co.,* 280 F.2d 453 (5th Cir.1960), the duty to defend under an insurance contract is distinct and separate from the obligation to indemnify one's insured. *Id.* at 458. The duty to defend is one which is personal to the relationship between the insurer and the assured, *id.* at 459; *Barton & Ludwig v. Fidelity & Deposit Co. of Maryland,* 570 F.Supp. 1470, 1473 (N.D.Ga.1983), and as such, there is no right of contribution among multiple insurers for costs incurred in defending the insured, absent a specific contractual agreement to that effect. *Barton & Ludwig, supra,* 570 F.Supp. at 1472–73. In any event, "[w]hatever may be the right ultimately to saddle off a part of the cost of defense actually undertaken once payment has been made ..., it is contrary to the very nature of the contract that the insurer can scout around in the hopes that it can find someone whose defense the assured is compelled to accept." *American F & C Co., supra,* 280 F.2d at 459–60.

The dilemma that ensues from these principles is that "[b]y refusing to defend, the [insurer] loses all opportunity to contest the negligence of the insured or the injured person's right to recover, and exposes itself to a charge of and penalty for breach of contract. [Yet b]y defending, it incurs considerable expense and may waive the claim of [actual] immunity from coverage[,]"

---

**25.** This position was reasserted in the loan receipt agreement entered into by and between Continental and Synalloy on August 26, 1983. Holland Deposition Exhibit 12. Under that agreement, Synalloy received "$197,500.00 as a loan, without interest, repayable ... only when, and in the event that SYNALLOY *collects* money from one or more of the insurers named as parties in said Civil Action." (emphasis added). There is no evidence in the record that Synalloy has "collected" other insurance to date. Instead, the evidence shows that General Accident has paid defense costs on various claims, and sought reimbursement from Synalloy, under an insuring agreement so providing.

since the general rule in Georgia is that a liability insurer who assumes and conducts a defense of an action brought against the insured with knowledge of facts which would constitute noncoverage under the policy without disclaiming liability and giving notice of its reservation of rights is estopped from thereafter setting up the facts of noncoverage.

*Richmond v. Georgia Farm Bureau Mutual Insurance Co.,* 140 Ga.App. 215, 217–18, 231 S.E.2d 245 (1976) (citations omitted).

 The Court has determined that Continental had a duty under the terms of its 1969 through 1972 policy to defend Synalloy against the underlying tort claims, when those claims were filed in 1981. Such a hindsight conclusion, however, does not appear to be dispositive under Georgia law as to whether this insurer acted in bad faith by refusing to defend. Rather, "the effect of an insurer's refusal to defend an action on the ground that the claim is not within the coverage of the policy depends primarily upon whether such refusal is justified or unjustified." *Farm Mutual Auto Insurance Co. v. Keene,* 111 Ga.App. 480, 482, 142 S.E.2d 90 (1965).

> If the refusal of the insurer was justified and the claim was *actually* outside the policy coverage, the refusal of the insurer to defend does not constitute a breach of contract and does not subject the insurer to any legal liability. A different situation exists, however, where the insurer refuses to defend an action against the insured based on a claim actually within the coverage of the policy because of an erroneous assumption that such claim is outside policy coverage.... 29A Am.Jur. 569, §§ 1457, 1458; 49 ALR2d 694, 703. By an unjustified refusal to defend an action against the insured the insurer becomes subject to certain new and positive obligations, including liabili-

ty for the amount of the judgment rendered against the insured. 29A Am.Jur. 571, § 1460; 49 ALR2d 717.

*Id.* (emphasis added). Moreover, "[t]he test of bad faith within the meaning of the law ... is as of the time of trial, in the final analysis, and not at the time of refusal to pay upon demand." *Interstate Life & Accident Insurance Co. v. Williamson,* 110 Ga.App. 557, 560, 139 S.E.2d 429 (1964).

As to this action, the trial on bad faith damages, as claimed by Synalloy against Continental, was held on July 1, 1985. However, months prior to that trial the Georgia Supreme Court had declared in *Newton, supra,* that the BNA claims *actually* were workers' compensation rather than tort claims. Continental never has contracted with Synalloy to provide excess workers' compensation insurance, so the state court's decision effectively affirmed Continental's position that the BNA claims *actually* were outside of its policy coverage. Thus, the Court is compelled under Georgia law to find that the refusal by Continental to defend its insured against those claims was justified.[26] Accordingly, Continental did not breach its contract of insurance and is not subjected to any legal liability under its policies with Synalloy. *See Farm Mutual Insurance Co. v. Keene,* 111 Ga.App. at 482, 142 S.E.2d 90. Synalloy's counterclaims against Continental for bad faith damages and unjust enrichment are dismissed.

## IV. *Summation*

For several years, the parties to this action have struggled with the law, the courts, and among themselves, to resolve the issue of insurance coverage on tort claims asserted by employees of the insured. Along the way, the Court has sought through a number of settlement

---

**26.** *Rutledge v. Dixie Automobile Insurance Co.,* 106 Ga.App. 577, 127 S.E.2d 683 (1962), in which the appellate court in reversing a general demurrer declined to determine as a matter of law the insurer's obligation to defend, is not in conflict with this decision. The case of *Richmond v. Georgia Farm Bureau Mutual Insurance Co.,* 140 Ga.App. 215, 231 S.E.2d 245 (1976), in which the insurer commenced a defense by fil-

ing an answer for its insured, with the caveat that it might later withdraw from such defense and while contending noncoverage under its policy, is distinguishable from the present action because Continental consistently denied any duty to defend, and did not enter a defense against the underlying tort claims on behalf of its insured.

conferences to finally bring an end to this dispute so as to stave off accumulating litigation costs and taxation of judicial resources. However, too many of the parties consistently have resisted any amicable arrangement, holding steadfast to their contention of noncoverage under their respective insuring agreements. The result is that the law is behind them, and we are out of the woods.

The conclusion reached by the Court in the foregoing discussion is that, with the exception of the letter agreement, Synalloy did not contract with its insurers to provide immediate coverage on tort claims arising out of its employees' exposure to BNA. Actually, the language of the various insurance policies presupposes that claims by employees for job-related injuries are brought under applicable workers' compensation laws, and the policy language likewise incorporates the concomitant limitations of those laws on actions against industry.

Accordingly, on the basis of all orders previously entered and the conclusions reached herein, judgment is entered in favor of Continental in this declaratory judgment action, all claims for damages are dismissed as being without merit, and the parties are to pay their own costs.